NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

ALLCOAST TRANSFER, INC. and Ward Moving and Storage, Inc., Respondents.

No. 84–5961.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 11, 1985.

Decided Jan. 9, 1986.

Karen Cordry (argued), Elliott Moore and Jesse Gill, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., for petitioner.

C. Douglas Lovett (argued), Rosenzweig, Schulz & Gillombardo, Cleveland, Ohio, Robert G. Harris, Boca Raton, Fla., for respondents.

Before MERRITT and CONTIE, Circuit Judges; and WEICK, Senior Circuit Judge.

CONTIE, Circuit Judge.

The National Labor Relations Board (Board), seeks enforcement pursuant to 29

U.S.C. § 160(e) of its decision and order issued against Allcoast Transfer, Inc. (Allcoast) and Ward Moving and Storage, Inc. (Ward Moving). The Board found that Ward Moving is the alter ego of Allcoast and Albert E. Ward, Inc. (A.E. Ward) and is therefore obligated to honor the collective bargaining agreement between A.E. Ward and Local 392 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Union). For the reasons that follow, we grant the petition for enforcement.

**I.**

Robert G. Harris purchased A.E. Ward, an Ohio corporation engaged in the moving and storage business, in 1976. Harris at all times was A.E. Ward's president and chief operating officer and owner of at least ninety percent of the company's stock. A.E. Ward essentially handled three types of moving business. First, it transported goods interstate under the authority of its own license issued by the Interstate Commerce Commission (ICC). Second, it transported goods intrastate under the authority of its own license issued by the Public Utilities Commission of Ohio. Third, it transported goods interstate as an agent for Atlas Van Lines, Inc. (Atlas) under the authority of an ICC license issued in Atlas' name. When the company acted in the capacity of Atlas' agent, it represented itself as "Atlas Van Lines." Otherwise, it operated under its corporate name, Albert E. Ward, or its trade name, Ward Moving and Storage. All truck drivers employed by the company, irrespective of whether they performed Atlas business or independent business,[1] were represented by Local 392.

In February 1982, Atlas adopted a new corporate policy which prohibited companies acting as Atlas agents from having their own independent ICC licenses. Atlas instructed its agents that they could "shelve" their independent operating authority or they could transfer it to a sepa-

---

1. Atlas Van Lines required that drivers had to be certified according to its standards in order to handle Atlas shipments. Non-certified drivers could not be assigned to Atlas jobs.

rate corporation which could operate under that authority as long as the business and equipment were not associated with Atlas. In order to preserve A.E. Ward's independent authorities, Harris opted to create a new corporation in a manner similar to that which Atlas suggested.

On December 10, 1982, Harris incorporated a new company to operate as the Atlas agent. The new company's name was Ward Moving and Storage, Inc. (Ward Moving), which was the trade name previously utilized by A.E. Ward. Harris transferred the Atlas agency relationship to Ward Moving, enabling Ward Moving to operate under Atlas' interstate operating authority. A.E. Ward, however, retained its own operating authorities to transport goods interstate or intrastate. At all times since Ward Moving's inception, Harris has been its sole officer and sole shareholder.

On January 18, 1983, Harris changed the corporate name of A.E. Ward to Allcoast Transfer, Inc. This change was also necessitated by the new Atlas policy that the name of the corporation not acting as the agent for Atlas could not be "similar to or otherwise identifiable with the name of the Atlas agent." Allcoast succeeded to A.E. Ward's independent authorities to transport goods and Harris continued to be president, chief operating officer and at least ninety percent shareholder of Allcoast.

Following these corporate changes, the headquarters of Allcoast was relocated to a separate nearby facility. Several pieces of equipment were repainted, so they would not be identified with Atlas, and were moved to this new facility. No clerical employees were transferred there. The new location had a maintenance facility at which both Allcoast and Ward Moving trucks were maintained and repaired. The new facility only remained open, however, for nine or ten months whereupon the Allcoast operation was reconsolidated with

Ward Moving and both companies again operated from the original facility.[2]

When Allcoast moved to the new location, Harris informed all of the employees who had worked for A.E. Ward that they had to choose the corporation for which they wanted to work, Allcoast or Ward Moving. Four A.E. Ward drivers continued to work as drivers for Allcoast and two others were hired to drive for Ward Moving. A.E. Ward's clerical employees were retained by Ward Moving.

On January 25, 1983, the Union notified Harris that it considered both Allcoast and Ward Moving to be bound by the collective bargaining agreement between A.E. Ward and the Union. Harris replied that A.E. Ward had changed its name to Allcoast and that Allcoast would comply with the agreement. However, Harris denied that Ward Moving was bound by the agreement, stating that Ward Moving was a completely separate corporation from A.E. Ward/Allcoast.

On May 16, 1983, the Union filed an unfair labor practice charge against both Allcoast and Ward Moving. After a hearing, the administrative law judge (ALJ) determined that Allcoast and Ward Moving are alter egos of A.E. Ward and of each other and therefore found that Ward Moving violated §§ 8(a)(5) and (a)(1) of the National Labor Relations Act (Act) (29 U.S.C. §§ 158(a)(5), (a)(1)) by repudiating the collective bargaining agreement A.E. Ward had with the Union. The Board affirmed the ALJ's finding in its decision reported at 271 N.L.R.B. No. 210 (1984). The Board ordered Allcoast and Ward Moving, jointly and severally, to cease and desist from their unfair labor practices. It also required the companies to compensate the Ward Moving employees for losses incurred due to the failure to honor the collective bargaining agreement and ordered the companies to post appropriate notice.

---

**2.** Harris testified before the ALJ that he had moved Allcoast to a separate location to "prove a point" that Allcoast and Ward Moving were two separate, distinct businesses. However, when he did not receive the business he had hoped for, Harris decided "there was no reason to go bankrupt to prove a point, to look good and play the game," so he returned the operation to the original facilities.

The Board seeks enforcement of the terms of its order.

## II.

The alter ego doctrine was developed to prevent employers from evading obligations under the Act merely by changing or altering their corporate form. The doctrine "will be applied, when appropriate, to treat two nominally separate business entities as if they were a single continuous employer." *Alkire v. NLRB.*, 716 F.2d 1014, 1018 (4th Cir.1983). To determine whether application of the doctrine is appropriate, the circumstances surrounding a change in corporate form must be examined to determine whether the change resulted in a *"bona fide* discontinuance and a true change of ownership" or was merely a "disguised continuance of the old employer." *Southport Petroleum Co. v. NLRB*, 315 U.S. 100, 106, 62 S.Ct. 452, 456, 86 L.Ed. 718 (1942). A determination of alter ego status is a question of fact, *id.*, and therefore the Board's conclusion must be enforced if supported by substantial evidence. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951).

This appeal focuses on which criteria should be used to determine whether a successor corporation is merely the alter ego of its predecessor. This court and various other circuit courts have recognized that factors relevant to a finding of alter ego status include "whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision and ownership." *Nelson Electric v. NLRB*, 638 F.2d 965, 968 (6th Cir.1981), citing *Crawford Door Sales Co.*, 226 NLRB 1144, 1144 (1976); *Goodman Piping Products Co., Inc. v. NLRB*, 741 F.2d 10, 12 (2d

Cir.1984); *NLRB v. Campbell-Harris Electric, Inc.*, 719 F.2d 292, 295 (8th Cir.1983); *NLRB v. Al Bryant, Inc.*, 711 F.2d 543, 553–54 (3d Cir.1983), *cert. denied*, 464 U.S. 1039, 104 S.Ct. 699, 79 L.Ed.2d 165 (1984); *Amalgamated Meat Cutters & Butchers Workmen v. NLRB*, 663 F.2d 223, 226–27 (D.C.Cir.1980). We also have observed that it is the Board's function to "strike a balance among each of the criteria" set forth above. *Nelson*, 638 F.2d at 968.

The respondents do not dispute that these control and operational factors are relevant inquiries, but argue instead that an additional factor is a prerequisite for imposition of alter ego status. They assert that the Board must find the existence of unlawful intent on the part of the employer, either anti-union animus or intent to evade obligations under the Act, in order to conclude that one company is the alter ego of another. The respondents further contend that the record fails to show such intent, arguing that the change in corporate form was necessitated solely by Atlas' policy change. Based on these arguments, the respondents conclude that Ward Moving cannot be considered the alter ego of A.E. Ward.

### A.

Neither this circuit nor the Supreme Court has addressed the issue raised by the respondents.[3] Accordingly, we are not bound by any precedent in deciding the intent issue today. The circuits which have considered this issue have disagreed as to its appropriate resolution.

The First Circuit and the Eighth Circuit have expressly adopted the approach urged by the respondents, holding that "[u]nlawful motive or intent are critical inquiries in an alter ego analysis."[4] *Penntech Papers,*

---

3. In *Nelson,* this court merely set forth the control and operational factors as "guiding criteria" without mentioning an intent element. Further, *Nelson* relied on a decision of the Board, *Crawford Door Sales Co., Inc.,* 226 NLRB 1144 (1976), which failed to address the intent issue. As a result, we conclude that this court has not been presented with this issue and therefore we are free to decide it at this time.

4. A similar, but purportedly broader, approach was adopted by the Fourth Circuit in *Alkire v. NLRB,* 716 F.2d 1014 (4th Cir.1983). There the court set forth a two-step analysis with an emphasis on the employer's motivation for changing its corporate form. The court stated:

When business operations are transferred, the initial question is whether substantially

*Inc. v. NLRB*, 706 F.2d 18, 24 (1st Cir.), *cert. denied*, 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983); *Iowa Express Distribution, Inc. v. NLRB*, 739 F.2d 1305, 1311 (8th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 595, 83 L.Ed.2d 704 (1984) (citing *Penntech*); *but see, NLRB v. Campbell-Harris Electric, Inc.*, 719 F.2d 292, 295 (8th Cir.1983) (previous Eighth Circuit opinion stating "a finding that two companies are in fact alter egos is proper if based upon substantial identity in terms of corporate ownership, management, business purpose, operation, equipment, customers, and supervision," without mention of an intent inquiry). Under the approach advocated by the First and Eighth Circuits, the Board would have to find intentional employer evasion before imposing alter ego status.[5]

A Third Circuit opinion, *NLRB v. Scott Printing Corp.*, 612 F.2d 783 (3d Cir.1979), has been cited as limiting imposition of alter ego status to instances where intent to evade union obligations is found. *See e.g., Alkire*, 716 F.2d at 1019. In *Scott Printing*, the court "[a]ssum[ed] without deciding that . . . the General Counsel must prove [the employer] intended to evade its duty to bargain." *Scott Printing*, 612 F.2d at 787. It is unclear, however, whether the Third Circuit has adopted intentional evasiveness as a prerequisite to a finding of alter ego status. We first note that one judge dissented in *Scott Printing* because the court extended the alter ego doctrine

"to a situation where no evidence of anti-union animus appears on the record." *Id.* at 789. The dissent argued that a finding of intent to evade labor obligations or anti-union animus is essential in alter ego cases, and that the court erred in not requiring such a finding. *Id.* at 790. We also observe that a more recent opinion indicates the Third Circuit does not consider a finding of anti-union animus or intentional employer evasiveness to be essential in an alter ego analysis. In *NLRB v. Al Bryant, Inc.*, 711 F.2d 543 (3d Cir.1983), *cert. denied*, 464 U.S. 1039, 104 S.Ct. 699, 79 L.Ed.2d 165 (1984), the court cited to *Scott Printing* but merely set forth the control and operational factors as the criteria relevant to a determination of alter ego status. *Id.* at 553–54. The court did not mention any intent element. Therefore, we doubt whether the Third Circuit has adopted an intent element as an essential inquiry under an alter ego analysis.

The Second Circuit has expressly rejected the argument that a finding of anti-union animus or an intent to evade is a prerequisite to holding that one company is the alter ego of another. In *Goodman Piping Products, Inc. v. NLRB*, 741 F.2d 10 (2d Cir.1984), the court observed "[t]he cases . . . show that anti-union animus may be 'germane,' . . . or even a sufficient basis for imposing alter ego status . . .; they do not establish that anti-union motivation is necessary." *Id.* at 12 (citations omitted).

---

the same entity controls both the old and the new employer. If this control exists, then the inquiry must turn to whether the transfer resulted in an expected or reasonably foreseeable benefit to the old employer related to the elimination of its labor obligations.

Without some future benefit reasonably accruing from the employer's action, then the "force" of the action ends with the transfer itself, and the transfer of ownership is *bona fide*. If, however, the transfer, by eliminating an NLRA-imposed duty, provides a continuing benefit to the old employer, then the force of the closing survives the transfer. To the extent that obtaining the benefit was a motive for the transfer, or was a reasonably foreseeable effect, the result represents a disguised continuance of the old employer.

*Id.* at 1020. The court further asserted that "[l]inking employer motivation for the transfer of its business to obtaining a future benefit

represents a broader standard than does requiring '[a]ntiunion animus or intent to evade labor obligations,' . . . and better strikes a balance between the notion of limited corporate liability and the protection of those employee rights embodied in the national labor laws." *Id.* (citation omitted). One circuit judge dissented from the court's approach, asserting that it was not necessary to show that an employer intended to evade the purposes of the Act in order to find alter ego status. *Id.* at 1022.

5. Both *Penntech* and *Iowa Express* cited the Note, *Bargaining Obligations After Corporate Transformations*, 54 N.Y.U.L.Rev. 624 (1979), as support. The Note asserts that "for an alter ego finding . . . the employer must act from anti-union animus." *Id.* at 639.

The court instead determined that "substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership" were the "key" inquiries and, in light of those criteria, found substantial evidence to support the imposition of alter ego status. *Id.* at 11.

Finally, we note that some circuits have given substantial weight to, but stopped short of making a prerequisite of, employer intent in determining alter ego status. The Tenth Circuit first observed in *NLRB v. Tricor Products, Inc.,* 636 F.2d 266 (10th Cir.1980), that there is no "hard-and-fast rule" in determining whether a successor employer is the alter ego of its predecessor, and that many factors are relevant. *Id.* at 270. The court then listed the considerations it believed were important, including the relationship between the management of the two companies, continuity of the workforce, continuity of equipment and location, similarity of customers and accounts, similarities in the type of work, and the assumption of liabilities by the successor company. *Id.* As to employer intent, the court stated:

> If an employer makes changes in its business operation to deliberatly get rid of the union, then the employer is more likely to be an *alter ego.* If, however, the employer has legitimate economic reasons for the changes, and is not motivated by anti-union sentiment, the second employer is more likely to be deemed a mere successor to the first. In connection with this particular aspect, we think evidence of anti-union sentiment by an employer, occurring either before or after the change in the structure of the business, is germane.

*Id.* Accordingly, the court found that the employer's intent is relevant, but did not hold it to be essential to imposing alter ego status.[6] The D.C. Circuit considered the elements relevant to a finding of alter ego status in *Fugazy Continental Corp. v.*

*NLRB,* 725 F.2d 1416 (D.C.Cir.1984). The court listed the same control and operational factors this court set forth in *Nelson* and added, "the Board will give weight to evidence that the motive for the transaction was to evade statutory and contractual duties under the NLRA or to escape the reach of the Board's remedies." *Id.* at 1419. A finding of motive or intent was not classified as a prerequisite, however.

■ Upon analyzing these opinions of our sister circuits, we conclude that a finding of employer intent is not essential or prerequisite to imposition of alter ego status. Instead, it is merely one of the relevant factors which the Board can consider, along with the well-established factors of substantial identity of management, business purpose, operation, equipment, customers, supervision and ownership, in determining alter ego status. We note that the essential inquiry under an alter ego analysis is "[w]hether there was a *bona fide* discontinuance and a true change of ownership ... or merely a disguised continuance of the old employer." *Southport Petroleum Co. v. NLRB,* 315 U.S. 100, 106, 62 S.Ct. 452, 456, 86 L.Ed. 718 (1942) ("If there was merely a change in name or in apparent control there is no reason to grant the petitioner relief from the Board's order of reinstatement; instead there is added ground for compelling obedience."). This essential inquiry does not require the Board to find that an employer intended to evade obligations under the Act in order to impose alter ego status. Instead, deciding whether a successor corporation is really the predecessor corporation by another name merely requires an examination of all the circumstances of each case, and a weighing of all the relevant factors. This conclusion is consistent with the cases discussing the alter ego doctrine since they generally recognize that the alter ego analysis should be flexible. *See, e.g., Goodman Piping Products, Inc. v. NLRB,* 741 F.2d 10, 11 (2d Cir.1984) ("[T]he cases explain that the test of alter ego status is

---

**6.** We note, however, that both *Penntech* and *Iowa Express* cited to *Tricor* in holding that unlawful motive or intent is a critical element in an alter ego analysis. We disagree that *Tricor* supports such a holding.

'flexible.' "); *J.M. Tanaka Construction, Inc. v. NLRB,* 675 F.2d 1029, 1033 (9th Cir.1982) (In an alter ego analysis, "[n]o factor is controlling and all need not be present."); *NLRB v. Tricor Products, Inc.,* 636 F.2d 266, 270 (10th Cir.1980) ("There is no hard-and-fast rule."). Under a flexible approach, no one element should be come a prerequisite to imposition of alter ego status; rather, all the relevant factors must be considered together. *See, e.g., Tanaka,* 675 F.2d at 1035 (Holding that common ownership is but one factor to be considered by the Board and it "is not a necessary prerequisite to an alter ego finding.").

■ Our rejection of the argument that the Board must find an intent to evade union obligations or anti-union animus before imposing alter ego status furthers the purpose of the alter ego doctrine. As we stated earlier, the doctrine was developed to prevent employers from evading obligations under the Act by merely changing or altering their corporate form. If we were to require a finding of employer intent, an employer who desired to avoid union obligations might be tempted to circumvent the doctrine by altering the corporation's structure based on some legitimate business reason, retaining essentially the same business, and utilizing the change to escape the unwanted obligations. Our flexible approach will discourage such attempts at circumvention by allowing the Board to weigh all the relevant factors instead of requiring it to always show the employer's intent to evade. Accordingly, even when purportedly legitimate reasons support an alteration in structure, the Board can prevent an employer from avoiding obligations under the Act.

#### B.

Having set forth the standard by which this court will analyze application of the alter ego doctrine, we now examine the imposition of alter ego status in the present case. This case involves a situation in which one predecessor employer, A.E. Ward, divided into two successor employers, Ward Moving and Allcoast. Since the respondents do not dispute that Allcoast is the alter ego of A.E. Ward,[7] we only examine the Board's findings regarding Ward Moving.

■ We conclude that there is substantial evidence to support the Board's finding that Ward Moving is the alter ego of A.E. Ward. The two enterprises have substantially identical management and supervision. Harris always managed A.E. Ward and he currently manages both Ward Moving and Allcoast. Harris formulates the operational and labor relations policies from his out-of-town office and instructs a supervisor at the companies' facility to implement the policies. Although the supervisor is officially only the supervisor of Ward Moving, he acts as an agent for Harris, the official supervisor of Allcoast, with regard to Allcoast's operations.[8] The business purpose and operations of A.E. Ward and Ward Moving are also substantially identical. As part of its business, A.E. Ward performed interstate moves on behalf of Atlas Van Lines. Ward Moving's business is essentially the same, operating as an agent for Atlas under Atlas' ICC authority. The equipment and the employees of the two companies likewise are substantially identical. Even though Ward Moving and Allcoast cannot use their trucks interchangeably due to the Atlas policy prohibiting trucks bearing its logo from performing non-Atlas work, Ward Moving primarily obtained its equipment from A.E. Ward and currently leases the original A.E. Ward trucks from Allcoast. Accordingly, equipment used by Ward Moving is the same which was used by A.E. Ward. Also, Ward Moving hired two

---

7. Allcoast had consistently complied with the collective bargaining agreement executed by A.E. Ward and the Union.

8. Ward Moving's supervisor could not officially be the supervisor of Allcoast since by working for Ward Moving he is a non-union employee and Allcoast is a union shop. However, in his capacity as Harris' agent, he essentially acts as Allcoast's supervisor.

of A.E. Ward's truck drivers as well as A.E. Ward's clerical staff.

Based on the above criteria there is clearly substantial evidence to support the Board's finding that Ward Moving is the alter ego of A.E. Ward without a determination of Harris' intent. When the circumstances so strongly support a finding of alter ego status, as they do here, the Board can properly weigh all of the factors and infer that the employer intended to evade union obligations. An inquiry into employer intent may be appropriate in other situations involving application of the alter ego doctrine but here it simply is not necessary.[9]

Accordingly, the Board's petition for enforcement is GRANTED.

9. We note, however, that even though the Board made no finding regarding Harris' intent, the record shows some evidence of anti-union animus. At the hearing before the ALJ, Harris testified "I don't want it [the union], I'll be honest with you, who needs it, who wants it." While a finding of intent is unnecessary in the present case, this statement indicates that Harris viewed a change in corporate structure as the opportunity to evade unwanted obligations under the Act.

