NORTHWESTERN OHIO ADM'RS, INC., Plaintiff

v.

S.E.A. BUILDERS CORP., et al., Defendants

No. 3:99CV7406.

United States District Court, N.D. Ohio, Western Division.

Jan. 2, 2002.

James H. O'Doherty, Robert A. Koenig, Thomas P. Dillon, Shumaker, Loop & Kendrick, Toledo, OH, for Northwestern Ohio Administrators, Inc., Plaintiffs.

Charles P. Baither, III, Robison, Curphey & O'Connell, Toledo, OH, for S.E.A. Builders Corp., defendant.

Margaret Mattimoe Sturgeon, Eastman & Smith, Toledo, OH, Patrick J Johnson, Eastman & Smith, Toledo, for Deke Enterprises, defendant.

## ORDER

CARR, District Judge.

This is an ERISA action to collect contributions due to a union-management welfare plan. In a prior decision, I upheld an "evergreen" provision between the plaintiff, Northwestern Ohio Administrators, Inc. (NOA) and the defendant S.E.A. Builders Corporation (SEA). NOA claims that the monies owed to it as a result of that prior decision can be recovered from the defendant Deke Enterprises (Deke), which is owned by the owners of SEA. The determinative issue, which was the subject of a nonjury trial, is whether SEA and Deke are alter egos, so that Deke can be held liable for the obligations of SEA to NOA.

To determine whether one company is the alter ego of another company a court must consider the extent to which the management, business purposes, operations, equipment, customers, supervision, and ownership are common to the two entities. In addition, the presence of anti-union animus is an important consideration. *NLRB v. Allcoast Transfer, Inc.,* 780 F.2d 576, 579 (6th Cir.1986). On consideration of those factors, I find, for the reasons that follow, that Deke and SEA are not alter egos. Judgment shall, accordingly, be entered in favor of Deke and against NOA.

SEA began operations in 1989. At the time, it was owned by Sam Frey, Al Frey and his wife, Amy Frey, and Ed Baer and his wife, Marlene Baer. Sam was the President and ran the business. Al was the job foreman, and spent about ninety-five percent of his time in the field overseeing work being performed at various job sites.

When formed and as first operated, SEA sold and erected steel buildings. In addition, SEA did some roofing. The business did not go well for two primary reasons. First, the only buildings SEA erected were those that it sold. Other sellers of steel buildings would not hire SEA to erect buildings that they sold because of SEA's status as a competitor in selling buildings. In addition, Sam sought to deal with the customers of other sellers in ways that further increased their unwillingness to have SEA erect the buildings they were selling.

Second, SEA developed a poor reputation due largely to the collapse of roofs that it had placed on buildings.

As a result, Al, though busy, was not earning a dependable paycheck. Amy was unhappy with that situation. For a period of time she had to take a second job in order to help support the family.

■ By late 1990, Sam had come to a parting of the ways with SEA; the other owners bought out Sam's interest in SEA. By the summer of the following year, Deke was incorporated. Its owners and the owners of SEA were and have remained the same—namely, Amy and Al and Marlene and Ed.

Deke is in the business of erecting steel buildings. SEA, whose sole active employee is Ed, sells steel buildings. This arrangement has lifted the shadow of SEA's reputation for poor workmanship from Deke, while also enabling it to get contracts to erect buildings sold by sellers other than SEA.

Deke had very little, if any business for several months after it was formed. It is has, however, grown over the years to be a reasonably prosperous company.

Al runs Deke, spending most of his time managing the company. He finds customers, bids jobs, and checks job sites from time to time. He has two job site foremen, who do the supervisory work in the field that he formerly did, before Deke was created, for SEA. Al's work for Deke finds him on a job site only about one day a month.

Ed, for his part, seeks to sell steel buildings for SEA. On an annual basis, Deke will erect between half and two-thirds of the buildings that SEA sells. That work has accounted, however, for only fifteen to twenty percent annually of the buildings erected by Deke. In other words, since the separation of SEA and Deke, and SEA left

off and Deke got into the business of erecting steel buildings, other sellers of steel buildings have been willing to employ Deke to erect the buildings that they are selling.

From time to time Ed will do some bookkeeping for Deke; he estimated that he spends no more than ten percent of his time working for Deke. Al's only work for SEA is to cover for Ed when he is on vacation.

The four owners hold separate annual meetings for each corporation. Though the venue is informal—the two couples go to dinner together—the transaction of the necessary corporate business is separate from their socialization.

Al's wife Amy testified, and I found her testimony to be particularly credible, that she actively supported Deke's creation, business, and operations. While Al was associated with SEA, he, in Amy's view, was not being treated fairly. Sam and Ed would be paid, while, on occasion, Al would not receive a paycheck.

Of paramount importance to Amy was that Al be in charge, and, as well, that she have an ownership role in the company so that, if her marriage, which had been adversely affected while Al was with SEA, failed, she would have something to fall back on. Though Amy has little involvement in the day-to-day operations of Deke, it was clear from her testimony that she actively pays attention to how the business is operating. It was equally clear that she felt that she has, and values, a say in the company's overall affairs, which she had not had when Al was with SEA.

Ed had signed the original collective bargaining agreement with the Ironworkers, who were employed to erect the buildings sold by SEA. He testified that the union representative told him that the papers he was signing were for one job only

(though union labor worked on at least two jobs for SEA).

Ed testified that part of his reasons for forming Deke was to be done entirely with labor relations and issues. He does not consider himself a good "people person," and enjoys being SEA's sole employee.

Ed's testimony is the only indication in the record that the owners were motivated by a desire to evade their obligations under the collective bargaining agreement when they formed Deke. There is simply no indication that Al, Amy, or Marlene was motivated by such desire.

I credit completely the testimony by Al and Amy about their motivation in forming Deke—namely to run a business with a single objective, rather than dual objectives working at cross-purposes, gain a steady source of income for Al and his family, and give Amy a greater say, and thus more control, over the business and its overall operation. In addition, Al wanted to be working closer to home.

There is some modest sharing of equipment and other assets. The four owners own a building, and lease separate offices to each company (and to at least one other tenant). The companies share a common phone line, fax machine, and coffee pot. Deke owns six vehicles, one of which is used by Ed in his business for SEA; but SEA reimburses Deke for the use of that vehicle. In addition, most of Al's business-related telephoning occurs with a cell phone provided by Deke.

The only other indicator of an alter ego status is the fact that Ed and Al are both paid equal amounts ($2,000 per week) by Deke, and neither receives any compensation from SEA. This rather peculiar arrangement results from advice given to the owners by their accountant that they have a "common paymaster."

In light of the foregoing, I find that SEA and Deke are not alter egos, but separate and distinct corporations. They are managed and operate separately in their daily affairs. They serve different business purposes and have, especially Deke, different customers. To the extent that they share some equipment, such sharing is slight and a matter of convenience, rather than indicative of a common enterprise. Their use of a "common paymaster," while ill-advised, simply does not outweigh the substantial evidence that the two companies are distinct in what they do, how they do it, and who does it.

In light of the foregoing, it is

ORDERED THAT judgment be entered in favor of the defendant Deke and against the plaintiff Northwestern Ohio Administrators.

So ordered.