NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0320n.06
Filed: May 5, 2006

No. 05-1395

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| NATIONAL LABOR RELATIONS BOARD, | ) ) ) | |
| Petitioner, | ) ) ) | ON PETITION FOR ENFORCEMENT |
| v. | ) ) | OF AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD |
| CROSSROADS ELECTRICAL, INC., AND ITS ALTER EGO GREER AND ASSOCIATES ELECTRICAL, INC., | ) ) ) ) | |
| Respondent. | ) | |

Before: COLE, GIBBONS, ROGERS, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge**. The National Labor Relations Board ("Board" or "NLRB") has applied to this court for enforcement of its order issued against Crossroads Electrical, Inc. ("Crossroads") and Greer and Associates Electrical, Inc. ("Greer and Associates"). In its order, the Board found that Greer and Associates is the alter ego of Crossroads and that both entities unlawfully refused to give effect to the collective bargaining agreement that existed between Crossroads and the International Brotherhood of Electrical Workers, Local Union 429, AFL-CIO, CLC (the "Union"), in violation of Section 8(a)(5) and (1) of the National Labor Relations Act ("NLRA" or "Act"), 29 U.S.C. § 158(a)(1), (5). Greer and Associates argues that enforcement is unwarranted because either the Union failed to file its charge against Crossroads and Greer and

1

Associates within the applicable statute of limitations or, assuming the charge was timely, substantial evidence did not support the Board's determination that Greer and Associates is an alter ego of Crossroads. For the following reasons, we grant the application for enforcement of the Board's order.

I.

Crossroads, which was formed in 1997, is an electrical contracting company. Crossroads works mainly in metropolitan Nashville, Tennessee, focusing primarily on small construction projects, such as restaurants and tenant build-outs, and service calls. Crossroads was initially owned and operated by three individuals: Micheal Thomas ("Thomas"), president; Billy Randolph, vice-president; and Thomas Greer ("Greer"), secretary-treasurer.[1] In March 2002, Billy Randolph gave his ownership interest in Crossroads to Thomas and Greer, making them each fifty-percent co-owners. At that time, Thomas continued as president, Greer became vice president, and Barbara Randolph became secretary-treasurer. Thomas and Billy Randolph performed the estimating and bidding work at Crossroads. Greer and Thomas hired and fired employees. Greer was responsible for the day-to-day supervision of employees and spent most of his time visiting job sites.

In its first year of operation, Crossroads signed a letter of assent, agreeing to be bound by the collective bargaining agreement between the Middle Tennessee Chapter of National Electrical Contractors Association ("NECA") and the Union. A letter of assent generally allows a multi-employer bargaining group – here, the NECA – to negotiate with a union on behalf of the employer,

---

[1] Billy Randolph is married to Barbara Randolph, the sister of Micheal Thomas. Stacey Greer, wife of Thomas Greer, is the daughter of Billy and Barbara Randolph. Barbara Randolph also worked at Crossroads, handling payroll and bookkeeping. Stacy Greer worked part-time as a secretary at Crossroads.

and the employer is bound to any collective bargaining agreement that results. The agreement between the NECA and the Union at issue in this case was effective from September 1, 2001 through August 31, 2005. The collective bargaining agreement requires all bound employers to notify the Union of their need for electricians and to seek job referrals exclusively through the Union's hiring hall.

In the middle of 2003, faced with the realization that Crossroads was losing money as a result of high labor costs, Greer decided that some changes had to be made. Greer had served for several years as an NECA representative on the board of the Nashville Joint Apprentice Training Committee ("JATC"), which trains apprentice and journeymen electricians. The JATC board consists of four NECA representatives and four Union officials. At a weekly JATC board meeting in June, Greer stated his opinion that wages and insurance and retirement contributions were getting too high and that something was going to have to be done if the situation was not worked out. At least four Union officials were present at the meeting. Sometime after the June 2003 JATC board meeting, union members complained to the Union that they had heard that Greer was "going nonunion." Based on these complaints, the Union filed internal charges against Greer in the "middle of 2003."

On July 22, 2003, Greer incorporated Greer and Associates. At that time, he told his wife Stacy Greer that Greer and Associates was going to be a "nonunion electrical company." Greer and Associates was issued a business tax license and filed for a federal tax number. Greer and Associates's initial officers were Greer and Barbara Randolph. At the time of incorporation, Greer was also a fifty-percent owner and officer of Crossroads and Barbara Randolph was its secretary-treasurer. On August 1, 2003, Barbara Randolph resigned as secretary-treasurer of Crossroads. On August 6, 2003, following another weekly JATC board meeting, the director of the JATC asked

3

Greer to resign from the JATC board. The JATC director had heard the rumors that Greer was "going nonunion" and told him that, if that was the case, he would need to resign because nonunion employers cannot sit on the JATC board. Greer did not resign at that time.

Barbara Randolph provided Greer a $10,000 interest-free loan with which to start Greer and Associates. With this money, Greer opened a bank account in the name of Greer and Associates. The check that Greer eventually provided as repayment on this loan was made out to Billy Randolph. Following this initial loan, Barbara Randolph gave Greer two additional interest-free loans of $4,000 and $9,000. These additional loans, which were repaid by Greer with checks made out to Billy Randolph, served, at least in part, to cover payroll expenses of respondent Greer and Associates during shortfalls.

Greer officially resigned from both Crossroads and the JATC board on August 18, 2003, and Greer and Associates began conducting business from Greer's home. On that day, Greer prepared Greer and Associates's first bid, which was for an office build-out project. Greer learned of this project while working at Crossroads. On August 19, 2003, Greer and Associates signed its first contract, which was for the construction of a Pizza Hut in Springhill, Tennessee. On August 20, 2003, Crossroads gave five of its trucks and some accompanying electrical equipment to Greer and Associates. Loan documents were prepared for the transaction, requiring Greer and Associates to make sixty monthly payments of $750 with interest; however, no money was ever paid by Greer and Associates to Crossroads. Greer and Associates received title to the trucks and the equipment from Crossroads without any money ever changing hands. In August of 2003, Greer and Associates used Crossroads's mailing address to obtain liability insurance.

On August 21, 2003, Greer and Associates placed an advertisement in the newspaper seeking electricians. The advertisement did not identify Greer and Associates as the employer, and Greer never advertised the new business in any way. Greer and Associates hired its first employee, without having first notified the Union of its need for electricians or going through the union hiring hall, on August 22, 2003.

Billy Randolph retired from Crossroads on August 31, 2003, leaving it solely operated by Thomas. Following Billy Randolph's retirement, Thomas did not seek any further projects for Crossroads. On October 20, 2003, Crossroads issued Greer a $500 bonus; it also issued bonuses in October to Stacy Greer and Barbara Randolph. On October 31, 2003, Crossroads finished its last major project and laid off its remaining employees. At that time, Thomas was serving as Crossroads's president and Stacey Greer, who was simultaneously working for Greer and Associates, was Crossroads's secretary-treasurer. Thomas engaged in various efforts to "wind down" Crossroads in November and December.

On November 1, 2003, Greer asked Mickey Patterson, a Crossroads employee who had been laid off a day earlier, to work for Greer and Associates. Shortly thereafter, Greer and Associates hired another former Crossroads employee, Preston Jackson. Ultimately, Greer and Associates hired at least five former Crossroads employees, not including members of the Randolph, Thomas, and Greer families. All of these employees engaged in the same type of work at both companies. In November 2003, Greer and Associates moved into Crossroads's office space and started using Crossroads's telephone number. Although Greer and Associates occupied the office by November 7 at the latest, Crossroads paid the rent for the months of November and December.

On December 16, 2003, Greer and Barbara Randolph offered Thomas the position of vice-president of Greer and Associates and a 50% ownership interest. When Thomas joined Greer and Associates on January 1, 2004, he waived any debt it owed Crossroads and brought with him all of Crossroads's remaining equipment and supplies. Thomas performed the estimating work at Greer and Associates, as he had at Crossroads, and Greer oversaw projects and employees, as he had at Crossroads. On its 2003 tax return, Crossroads identified Greer as a fifty percent owner of the company through the month of December.

In early February 2004, Michael Bearden, the Union's assistant business manager, began hearing rumors that Crossroads was no longer in business. Bearden called Crossroads's telephone number and Stacy Greer answered the call as "Greer and Associates." Bearden asked Stacy to explain the difference between the two companies. She stated that the companies were "pretty much the same . . . except for [Greer and Associates] isn't union any more," and that Greer and Associates "just [took up] Crossroads' old work" and "old customers." Stacy added that Greer and Associates decided to operate nonunion because it is "[h]ard to get jobs, hard to compete . . . when you are union versus nonunion." Bearden then visited some of Greer and Associates's job sites. During the visit, he noticed that Greer and Associates's trucks still had "Crossroads" written on them and that the vehicles were still registered to Crossroads.

On February 20, 2004, the Union filed a charge with the Board alleging that Greer and Associates is an alter ego of Crossroads and thus violated Section 8(a)(5) of the Act by failing to honor the collective bargaining agreement between Crossroads and the Union. On March 5, 2004, Greer and Associates denied the Union's demand for recognition as the collective bargaining

6

representative of Greer and Associates's employees and refused to give effect to the terms of the collective bargaining agreement.

On April 30, 2004, a complaint issued on the allegations raised in the charge. Greer and Associates answered, denying any violation of the Act and raising the affirmative defense that the Union's charge was filed outside of the statute of limitations. On July 14 and 15, 2004, a hearing before an administrative law judge was held. Following this hearing, the administrative law judge issued a decision on September 1, 2004, finding that Greer and Associates was the alter ego of Crossroads and that both entities had violated Section 8(a)(5) and (1) of the Act by refusing to honor the collective bargaining agreement. Greer and Associates filed its exceptions to the administrative law judge's decision.

On December 20, 2004, the Board issued a decision and order affirming and adopting the judge's findings that Greer and Associates and Crossroads were alter egos and that they had violated the Act. 343 N.L.R.B. No. 112 (2004). On March 29, 2005, the Board filed with this court an application for enforcement of its order.

## II.

On appeal, Greer and Associates challenges the Board's finding that it is an alter ego of Crossroads and the Board's determination that the Union's charge was timely filed. Greer and Associates does not dispute that Crossroads was bound by virtue of its letter of assent to the collective bargaining agreement during all times encompassing the events in question. Nor does Greer and Associates challenge the Board's conclusion that, if it was the alter ego of Crossroads, its actions violated that agreement. The only two questions on appeal are whether Greer and Associates

7

was bound to the agreement as a result of its status as an alter ego of Crossroads, and whether the Union filed its charge within the statute of limitations.

We review the Board's factual determinations as well as the Board's application of law to these facts under a substantial evidence standard. *Pleasantview Nursing Home, Inc. v. NLRB*, 351 F.3d 747, 752 (6th Cir. 2003); *FiveCAP, Inc. v. NLRB*, 294 F.3d 768, 776 (6th Cir. 2002). "Evidence is substantial when it is adequate, in a reasonable mind, to uphold the [NLRB's] decision." *Pleasantview Nursing*, 351 F.3d at 752 (quoting *NLRB v. St. Francis Healthcare Ctr.*, 212 F.3d 945, 952 (6th Cir. 2000)). "This Court defers to the Board's reasonable inferences and credibility determinations, even if we would conclude differently under *de novo* review." *FiveCAP*, 294 F.3d at 776.

A.

Under Section 8(f) of the Act, employers in the building and construction industry may enter into a collective bargaining agreement with a union before the union has established majority status. 29 U.S.C. § 158(f); *see also Electrical Workers Local 58 Pension Trust Fund v. Gary's Elec. Service Co.*, 227 F.3d 646, 653 (6th Cir. 2000). Such an agreement is often referred to as a Section 8(f) or "prehire" agreement. Although either party may repudiate a Section 8(f) or pre-hire agreement once it expires by its terms, an employer that refuses to give effect to the Section 8(f) agreement while it is in effect thereby violates Section 8(a)(5), which makes it "an unfair labor practice for an employer . . . to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5); *Gary's Elec. Service Co.*, 227 F.3d at 653; *John Deklewa & Sons, Inc.*, 282 N.L.R.B. 1375, 1377-78, 1389 (1987). In addition, any violation of Section 8(a)(5) produces a derivative

8

violation of Section 8(a)(1), which makes it an unfair labor practice to "to interfere with, restrain, or coerce employees in the exercise" of their statutory rights. 29 U.S.C. § 158(a)(1).

An employer cannot avoid its obligations under Section 8(a)(5) and (1) by forming a new corporate entity that is merely the alter ego of the old employer. *Howard Johnson Co. v. Detroit Local Joint Executive Bd., Hotel & Restaurant Employees & Bartenders Int'l Union*, 417 U.S. 249, 259 n.5 (1974); *Southport Petroleum Co. v. NLRB*, 315 U.S. 100, 106 (1942); *NLRB v. Fullerton Transfer & Storage Ltd.*, 910 F.2d 331, 336 (6th Cir. 1990); *NLRB v. Allcoast Transfer, Inc.*, 780 F.2d 576, 580-81 (6th Cir. 1986). One business entity is therefore bound by the collective bargaining agreement between another business entity and a union if the two business entities are alter egos. *Allcoast Transfer*, 780 F.2d at 582-83; *Nelson Elec. v. NLRB*, 638 F.2d 965, 968 (6th Cir. 1981).

"[T]he essential inquiry under an alter ego analysis is '[w]hether there was a bona fide discontinuance and a true change of ownership . . . or merely a disguised continuance of the old employer.'" *Allcoast Transfer*, 780 F.2d 576, 581 (6th Cir. 1986) (quoting *Southport Petroleum*, 315 U.S. at 106). The factors to be considered are well established: we examine whether the two entities possess substantial identity of management, business purpose, operation, equipment, customers, supervision and ownership. *Fullerton Transfer*, 910 F.2d at 336; *Allcoast Transfer*, 780 F.2d at 579, 581-82. In addition, employer intent is examined. *Allcoast Transfer*, 780 F.2d at 581-82. The alter ego analysis is "flexible," and generally requires the "examination of all the circumstances of each case, and a weighing of all the relevant factors." *Id.* at 581. This court has repeatedly noted that "it is the Board's function to strike a balance among each of the criteria set forth above." *Fullerton Transfer*, 910 F.2d at 336 (internal quotation marks and citation omitted); *Allcoast Transfer*, 780 F.2d at 579. Moreover, the finding that two business entities are alter egos is a question of fact which is

9

entitled to affirmance if supported by substantial evidence. 29 U.S.C. § 160(e); *Allcoast Transfer*, 780 F.2d at 579.

Substantial evidence on the record supports the Board's determination that Crossroads and Greer and Associates were alter egos. When Greer and Associates was formed, Greer was an officer and a fifty percent owner of Crossroads. When Thomas officially joined Greer and Associates on January 1, 2004, the ownership of the two companies was identical. Thereafter, Thomas performed the estimating work while Greer oversaw projects and employees, as they had at Crossroads. The two companies engaged in primarily the same type of work: small construction job electrical contracting. Greer and Associates operated from Crossroads's offices, although Crossroads continued to pay the rent through December, and used Crossroads's telephone number. Crossroads gave Greer and Associates vehicles and equipment without charge. These vehicles were registered to Crossroads and bore Crossroads's name while Greer and Associates used them on jobs. In short, substantial evidence regarding the identity of management, business purpose, operation, equipment, customers, supervision and ownership supports the Board's decision that the two entities were alter egos.

Also critical is the Board's finding that the intent of Greer and Thomas in forming Greer and Associates was to avoid Crossroads's contractual labor obligations. Although this circuit does not require the Board to show that an employer intended to circumvent its labor obligations in order to establish that one company is the alter ego of another, *see Allcoast Transfer*, 780 F.2d at 581, such a showing lends considerable support to an alter ego finding. *See Fullerton Transfer*, 910 F.2d at 337 ("[I]ntent to thwart a board order or statutory requirement is an important criteria"). On appeal, Greer and Associates does not challenge the Board's finding that the intent of Greer and Thomas was to

10

circumvent labor obligations. Thus, Greer and Associates has abandoned the right to object to those determinations and "has effectively admitted the truth of those findings." *NLRB v. Kentucky May Coal Co., Inc.*, 89 F.3d 1235, 1241 (6th Cir. 1996). This uncontested finding that Greer and Thomas formed Greer and Associates with the intent to avoid its contractual and statutory obligations provides significant support for the Board's conclusion that Greer and Associates and Crossroads are alter egos.

On appeal, Greer and Associates concedes that there is substantial evidence that, as of "mid-December" of 2003, Greer and Associates and Crossroads had "substantially identical management, business, purpose, operation, equipment, customers, supervision, and ownership." Greer and Associates argues, however, that the Board should have focused on the events at the formation of Greer and Associates as opposed to later developments.[2] Greer and Associates asserts that the Board mistakenly rejected its own precedent, *George C. Shearer Exhibitors Delivery Service*, 262 N.L.R.B. 622 (1982), which, according to Greer and Associates, requires the Board to place greater weight on the developments that took place at the time the second company was established than on the developing status of the new company in later years. Greer and Associates construes

---

[2]We note that, although Greer and Associates argues that this court must focus on events at the formation of the company rather than on events that followed formation, Greer and Associates relies heavily on events between July 22, 2003 and mid-December 2003 to support its position that it is not an alter ego of Crossroads. For instance, Greer and Associates argues that it operated out of different facilities than Crossroads for the "first four months of existence"; that Greer was the only person involved in management and supervision of Greer and Associates "[u]ntil mid-December"; that Greer sought capital from outside investors, an event which occurred "[w]ithin the first several months of Respondent Greer's existence"; and that Thomas either interviewed for or had conversations about other job positions in October, November, and December 2003. Thus, Greer and Associates encourages this court to consider numerous events that followed Greer and Associates's formation, so long as those events are helpful to its position. What Greer and Associates never does, however, is offer this court any reason why it should examine events up until mid-December but then abruptly stop examining events after mid-December.

*Shearer* to mean that the Board is limited to examining events at the immediate formation of a new company to determine whether it is the alter ego of a pre-existing company.

Greer and Associates's reliance on the Board's *Shearer* decision is misplaced for multiple reasons. First, Greer and Associates misreads *Shearer*. In *Shearer*, the Board decided that two business entities were alter egos because of the similarities that existed at formation, even though the companies' identities *diverged* as time went on. *See* 262 N.L.R.B. at 623-24. *Shearer* therefore refers to discounting subsequent divergence, not convergence. *See id.* at 624 ("On the question of whether one company and a successor are one and the same, . . . the really determining factors are whether both do the same kind of business and are owned and operated by the same people. . . . If both these elements remain the same, small changes in the day-to-day running of the business mean nothing."). Moreover, the Board in *Shearer* actually examined the relationships between the entities for three years following the formation of the second entity. *Id.* at 624. Second, as the Board correctly noted, "The applicable precedent in the circumstances of this case is stated in *Blue & White Cabs*, 291 NLRB 1047, 1048 (1988), where the Board, in finding no alter ego, held that 'to restrict consideration of the alter ego issue to . . . [the time of the alleged alter ego's] formation would distort the picture of . . . [its] essential identity and purpose.'" Thus, the Board's own precedent actually encourages consideration of events occurring beyond the immediate formation of a new business entity. Third, the approach of *Blue & White Cabs* – that the Board may look to events outside immediate formation – is entirely consistent with Sixth Circuit and Board precedent indicating that the alter ego analysis is a flexible, balance-striking, functional analysis. *See, e.g., Fullerton Transfer*, 910 F.2d at 336; *Allcoast Transfer*, 780 F.2d at 581-82; *Nelson Elec.*, 638 F.2d at 968. Indeed, this court examined events following incorporation in *Allcoast Transfer*. *See* 780 F.2d at 582. As the

12

Board correctly stated, to limit the analysis to the very beginning of a new entity's existence would make avoidance of obligations under the Act a matter of merely waiting a short period of time before resuming full operations. *See J. Vallery Elec., Inc. v. NLRB*, 337 F.3d 446, 451 n.15 (5th Cir. 2003) ("Because the alter ego doctrine contemplates the existence of a predecessor corporation and a successor corporation, a single person need not own, manage, or supervise both corporations at the same time. The doctrine would be rendered useless if an employer could avoid liability by simply washing his hands of one company and starting a new one."). In short, neither the *Shearer* decision nor any other by the Board or this court rigidly limits the Board's analysis to the entities as they existed at the time of the second company's formation. In this case, the Board engaged in exactly the type of functional analysis that inheres in an alter ego case.

In sum, the Board properly examined the events that took place within the first six months of Greer and Associates's incorporation. Substantial evidence of events during this time period supports its decision, as Greer and Associates concedes, that Greer and Associates and Crossroads are alter egos.

B.

We now turn to consideration of the timeliness of the Union's charge. Under Section 10(b) of the Act, "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board." 29 U.S.C. § 160(b). The six month clock runs from the date on which the plaintiff "discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation." *Taylor Warehouse Corp. v. NLRB*, 98 F.3d 892, 899 (6th Cir. 1996) (quoting *Nida v. Plant Protection Assoc. Natl.*, 7 F.3d 522, 525 (6th Cir. 1993)); *see also NLRB v. Allied Products Corp., Richard Bros. Div.*, 548 F.2d 644, 650 (6th Cir.

13

1977) ("[T]he six month limitation period does not begin to run until the employer's unlawful activity, which is the basis for the unfair labor practice charge, has become known to the charging party."). "This is only a specific application of the general rule that a limitation period begins to run when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged (violation)." *Id.* (quotation marks and citations omitted). The party asserting the statute of limitations defense "bears the burden of establishing that a charging party received such notice." *Taylor Warehouse Corp.*, 98 F.3d at 899.

In this case, the Union filed its unfair labor practice charge on February 20, 2004. Six months prior to that date was August 20, 2003. Therefore, if the Union had actual or constructive notice, before August 20, 2003, that Greer and Associates committed an unfair labor practice, then its charge was filed outside of the Section 10(b) statute of limitations.

The Board found that the first date on which Greer and Associates failed to abide by the Section 8(f) agreement was August 21, 2003 – the date on which Greer and Associates placed an anonymous help-wanted advertisement in the newspaper rather than seeking referral of employees from the Union. Contrary to Greer and Associates's contention on appeal, the Board did not conclude that this event was the "initial triggering date for the statute of limitations." Rather, the Board clearly stated, "The Union had *no notice* of [the placing of the advertisement] because the advertisement did not identify the name of the employer." The Board did not specify exactly when the statute of limitations period began to run; instead, the Board concluded that there was no evidence that any employee was hired or that Greer and Associates was failing to pay contractual wages or make appropriate contributions prior to August 20, 2003. For this reason, the Board found that Greer and Associates had failed to establish a valid Section 10(b) defense.

14

Greer and Associates first claims that the Union had either actual or constructive notice of its repudiation of the Section 8(f) agreement prior to August 20, 2004. Specifically, Greer argues that, as of August 6, the Union had either actual or constructive knowledge that: (1) Greer had formed a new company; (2) the new company was an alter ego of Crossroads; and (3) the new company was not abiding by the collective bargaining agreement. According to Greer and Associates, when combined, these events triggered the statute of limitations. To show that the Union knew that Greer had formed a new company that was not abiding by the terms of the collective bargaining agreement, Greer and Associates points first to the internal union charges filed against Greer by the Union in the "middle of 2003," which were based on union member complaints that Greer had formed a nonunion company. Greer also notes that, on August 6, 2003, the JATC director requested Greer's resignation from the board because he had formed a nonunion company. According to Greer and Associates, this request for resignation came after Greer had told the JATC, including its four Union officials, that he felt constrained to do something about the high labor costs, and after the JATC director had spoken with board about the need to request Greer's resignation because he had formed a nonunion company. None of these events, however, constitute the basis for the unfair labor practice charge or the acts constituting the alleged violation. This court has previously held in an unpublished opinion that mere incorporation of an alter ego cannot be an unfair labor practice. *See R.L. Reisinger Co., Inc. v. NLRB*, Nos. 93-6430, 93-6560, 1994 WL 706749, at *2 (6th Cir. Dec. 19, 1994). In that case, this court rejected a similar argument:

> It is undisputed that proof of alter ego status, on which the company's liability turns, depends on the circumstances of the 1981 incorporation, circumstances well outside the limitations period. Nothing in the collective bargaining agreement or the applicable labor laws, however, prohibited the incorporation of a bound employer. The 1981 incorporation was therefore not an unfair labor practice. Rather, the alleged unfair labor practices were the

15

> company's hiring of workers outside the hiring hall and Bernadine Reisinger's letter contending that the company had no agreement with the union, both of which undisputedly occurred within the limitations period.

*Id.* Nor can mere speculation on the part of Union members or officials that the new company, Greer and Associates, might hire nonunion employees at some future date be equated to an unfair labor practice. As the Seventh Circuit has explained:

> Rumors or suspicions will not do; nor is it relevant when an unlawful decision was actually made, if the decision was not communicated to the affected party until later. Moreover, the decision must be final, and not subject to further change; knowledge that another party might commit an unfair labor practice when the time is right will not start the 10(b) period. While the victims of an unfair labor practice should be encouraged to file a charge with the NLRB as soon as possible, individuals should not be forced to file anticipatory or premature charges, challenging tentative or merely hypothetical decisions, in order to protect their statutory rights. The 10(b) period does not commence until an aggrieved party has knowledge of the facts necessary to support a present, ripe, unfair labor practice charge.

*Esmark, Inc. v. NLRB*, 887 F.2d 739, 746 (7th Cir. 1989) (footnotes omitted); *accord NLRB v. Glover Bottled Gas Corp.*, 905 F.2d 681, 684 (2d Cir. 1990); *A&P Brush Mfg. Corp.*, 323 N.L.R.B. 303, 309 (1997) ("The equivocal, vague nature of the statements – [the employer's] telling the employees that he was intending to establish a nonunion operation, without stating how or when this entity would commence operations, is not sufficient to provide the Union with the requisite clear and unequivocal notice of a violation of the Act.") (quotation marks and citation omitted). Indeed, at any point up until it placed the advertisement without first notifying the Union, Greer and Associates could have decided to honor the collective bargaining agreement and seek its initial employees through the Union. Although Union employees may have suspected that Greer and Associates would violate the collective bargaining agreement, any charge filed before August 21, 2003 would have been premature and purely anticipatory. In short, prior to Greer and Associates's making some effort to fill its

16

employment positions without involving the Union or expressly repudiating its agreement, there was no unfair labor practice on its part.

Greer and Associates also argues that it provided constructive notice of its repudiation of the collective bargaining agreement when it failed to comply with some of the agreement's express provisions, none of which are directly linked to hiring practices. Specifically, Greer and Associates claims that it did not comply from the time of incorporation with three of the agreement's sections: Section 2.03, which states that a bound employer recognizes the Union as the exclusive representative of all its employees; Section 1.02(a), which states that an employer desiring to change or terminate the agreement must provide 90 days written notice; and Section 2.05, which requires bound employers to post a surety bond. As an alter ego of Crossroads, Greer and Associates was bound by all of the terms of the collective bargaining agreement. Thus, according to Greer and Associates, by forming a new company which did not provide the Union with recognition, a bond, or notice of termination of the agreement, Greer and Greer and Associates constructively gave notice to the Union that it was violating the agreement.[3]

---

[3]The Board did not find that Greer and Associates violated these provisions. Although Greer and Associates argues that the Board found that it had violated every provision in the agreement, this argument is unsupported by the administrative record. The Board held that Greer and Associates and Crossroads engaged in unfair labor practices when Greer and Associates placed an advertisement in the newspaper for employees without seeking referral from the Union, hired two employees without "referr[al] by the Union," "fail[ed] to compensate employees on the basis of the classifications set out in the collective bargaining agreement," and failed to make "contractually required Fund contributions." There is no mention by the Board of contractual violations of Sections 1.02(a), 2.03, and 2.05. Thus, contrary to Greer and Associates's assertion, the Board did not find that Greer and Associates violated those provisions. Nor is there any evidence in the record that Greer and Associates brought these provisions to the Board's attention. On appeal, Greer and Associates offers no authority which would prompt this court to find contractual violations that were not alleged by the Union nor determined by the Board.

17

Greer and Associates's failures to provide the Union with recognition, a bond, or written notice of termination were not violations of the agreement, or at least they were not violations which could have provided the Union with notice. With regard to recognition and the bond, as the alter ego of Crossroads, there was no contractual reason for Greer and Associates to recognize the Union or post a surety bond, because Crossroads had already done these things. Thus, there were no contractual violations in this regard. With regard to the 90 day notice, although it is true that neither Crossroads nor Greer and Associates provided the Union with written notice of its desire to change or terminate the agreement, the failure to properly provide notice obviously cannot give notice. Finally, even if Greer and Associates's conduct did violate the agreement and the Union had actual or constructive notice of the violations, such isolated contract violations do not constitute repudiation of a Section 8(f) agreement. *See Gary's Electric Service Co.*, 227 F.3d at 657 ("The repudiation by conduct doctrine typically requires something more than mere breach of the 8(f) contract, in that the employees and the parties must be put on notice that the contract was void."). These alleged contract violations, unrelated to the unfair labor practices at issue in this case, did not provide the Union with constructive notice of Greer and Associates's labor violations.

III.

For the foregoing reasons, we grant the Board's application to enforce its order.

18