RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0049p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

TRUSTEES OF OPERATING ENGINEERS LOCAL 324
PENSION FUND,

*Plaintiff-Appellee*,

*v.*

BOURDOW CONTRACTING, INC.,

*Defendant-Appellant*.

No. 18-1491

───────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:15-cv-12272—Stephen J. Murphy, III, District Judge.

Argued: January 31, 2019

Decided and Filed: March 21, 2019

Before: CLAY, COOK, and LARSEN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Joshua J. Leadford, MASUD LABOR LAW GROUP, Saginaw, Michigan, for
Appellant. Matthew I. Henzi, SULLIVAN, WARD, ASHER & PATTON, P.C., Southfield,
Michigan, for Appellee. **ON BRIEF:** Joshua J. Leadford, David J. Masud, Kraig M. Schutter,
MASUD LABOR LAW GROUP, Saginaw, Michigan, for Appellant. David J. Selwocki, Jessica
L. Schuhrke, SULLIVAN, WARD, ASHER & PATTON, P.C., Southfield, Michigan, for
Appellee.

———————————

**OPINION**

———————————

CLAY, Circuit Judge.  Defendant Bourdow Contracting, Inc. appeals the district court's February 6, 2018 order granting Plaintiff Trustees of Operating Engineers Local 324 Pension Fund's motion for summary judgment on the grounds that Defendant is the alter ego of Bourdow Trucking, Inc.  Plaintiff's complaint seeks recovery of withdrawal liability that Bourdow Trucking, Inc. owed to Plaintiff pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1381(a).  For the reasons set forth below, we **AFFIRM** the district court's grant of summary judgment.

**BACKGROUND**

**Factual Background**

Bourdow Trucking, Inc. ("Trucking") was incorporated in 1967.  From its inception, Trucking sold and transported dirt, stone, and sand throughout Michigan's Lower Peninsula.  It also engaged in construction site preparation and excavation.

Trucking was owned by Dan Bourdow Sr., his wife Patricia, and their children Dan Jr., Barb, Cindy, and Joe.[1]  Dan Sr., Patricia, Dan Jr., and Joe served as Trucking's corporate officers—Chief Executive Officer, Secretary, President, and Vice President of Operations, respectively.  And Trucking also employed other members of the Bourdow family, including Barb's husband Craig and Dan Jr.'s son Jason.  In total, Trucking employed up to 30 people, operating out of an office building in Saginaw, Michigan.

For most of its existence, Trucking employed a unionized workforce.  Accordingly, Trucking executed numerous collective bargaining agreements with the Operating Engineers Local Union 324 (the "Union").  And as part of those collective bargaining agreements, Trucking made fringe benefit payments to Plaintiff—the trustees of the Union's pension fund.

---

[1]Both parties refer to the relevant members of the Bourdow family by these names.  For simplicity, we do as well.

In 2007, Trucking began to experience financial difficulties. As a result, Trucking terminated its collective bargaining agreement with the Union, relieving Trucking of its obligation to make fringe benefit payments to Plaintiff. However, because the individual responsible for making these payments was never told to stop doing so, Trucking continued to make fringe benefit payments to Plaintiff until July 2011. At that time, Plaintiff mailed an uncashed check back to Trucking, and no further payments were made.

In August 2012, Plaintiff informed Trucking that because Trucking had completely withdrawn from the Union's pension fund in July 2011, Trucking had incurred withdrawal liability pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C § 1381(a).[2] Plaintiff assessed that Trucking owed $1,163,279 in withdrawal liability. And Plaintiff demanded payment in installments beginning on November 1, 2012.

Shortly thereafter, Trucking called a meeting to discuss its response options. Dan Sr., Patricia, Dan Jr., Barb, Cindy, and Joe attended the meeting, as did Trucking's accountant Gregg Greenwood, Trucking's longtime labor lawyer David Masud, and Trucking's newly-hired bankruptcy lawyer John Lozano. At the meeting, it was determined that Trucking could not afford to pay the assessed amount of withdrawal liability. Accordingly, other response options were considered, including negotiating with Plaintiff to lower the amount owed, and filing for bankruptcy. No decision was reached at that time.

In November 2012, Trucking missed its first withdrawal liability payment, and Plaintiff filed a lawsuit against Trucking to recover it. However, that lawsuit was stayed when Trucking filed for Chapter 7 bankruptcy on March 12, 2013. As part of Trucking's bankruptcy proceedings, Plaintiff filed a proof of claim for $1,272,187—the amount of withdrawal liability Trucking owed plus interest. Trucking did not object to the claim, and it was allowed pursuant

---

[2]Withdrawal liability is a statutory obligation imposed upon a member of a multi-employer pension plan if that member partially or completely withdraws from the plan. While prior to 1980, an employer that withdrew from a multi-employer pension plan could typically do so without any penalty, this often resulted in increased funding obligations for those employers who remained in the plan. Accordingly, in 1980, Congress enacted the Multiemployer Pension Plan Amendments Act, Pub. L. No. 96-364, 94 Stat. 1208, which amended ERISA in part by imposing withdrawal liability on employers that withdraw from an underfunded multi-employer pension plan. The goal of this liability was to ensure that each member paid its fair share of the plan's obligations. *See generally* Lawrence Gelber, et al., *The Benefit of Whose Bargain? Courts Grapple with Administrative Expense Priority for Postpetition Withdrawal Liability Claims*, 21 J. Bankr. L. & Pract. 4 Art. 6 (2012).

to the Bankruptcy Code, 11 U.S.C. § 502(a).  At the conclusion of Trucking's bankruptcy proceedings, Plaintiff received $52,034 on its claim.

While Trucking was coming to an end, another Bourdow family company was just beginning.  Defendant, Bourdow Contracting Inc., was incorporated on November 2, 2012—the day after Trucking missed its first withdrawal liability payment.  And Defendant bid on its first project on March 10, 2013—two days before Trucking filed for bankruptcy.  Since its inception, Defendant has engaged in construction site preparation and excavation in Saginaw, Bay, and Midland counties in Michigan's Lower Peninsula.  It also engages in occasional snow plowing and other miscellaneous projects.

Defendant is owned by Dan Jr., Joe, and Jason.  Dan Jr., Joe, and Jason serve as Defendant's corporate officers—Secretary, Vice President, and President, respectively.  And Defendant also employs other members of the Bourdow family, including Craig, and retains the services of other professionals formerly retained by Trucking, including Gregg Greenwood and John Lozano.  In total, Defendant employs up to 8 people, operating out of Dan Jr.'s home in Saginaw, Michigan.

### Procedural History

In 2015, Plaintiff filed a lawsuit against Defendant in the United States District Court for the Eastern District of Michigan, seeking to recover the outstanding withdrawal liability that was not satisfied during Trucking's bankruptcy proceedings.  Plaintiff's complaint alleges (1) that Defendant was created for the purpose of evading Trucking's withdrawal liability, and thus is responsible for Trucking's withdrawal liability pursuant to 29 U.S.C § 1392(c), and (2) that Defendant is the alter ego of Trucking, and is thus responsible for Trucking's withdrawal liability pursuant to the equitable doctrine of alter ego.  Plaintiff's complaint seeks the same amount for which it submitted a proof of claim in Trucking's bankruptcy proceedings— $1,272,187.

Following discovery, both parties filed motions for summary judgment.  On February 6, 2018, the district court entered an order denying Defendant's motion for summary judgment and granting Plaintiff's motion for summary judgment on the grounds that Defendant is the alter ego

of Trucking.  In making that determination, the district court applied the alter-ego test of the National Labor Relations Act of 1935 ("NLRA"), 29 U.S.C. § 151 *et seq*.  After additional briefing, the district court also determined that Plaintiff was entitled to a judgment in the amount of $3,221,981—the amount of Trucking's withdrawal liability, less the amount paid to Plaintiff at the conclusion of Trucking's bankruptcy proceedings, plus interest and fees awarded pursuant to 29 U.S.C. § 1132(g)(2).

This appeal followed.

## DISCUSSION

### I.  Standard of Review

Generally, alter-ego determinations are findings of fact that we review for clear error. *See Trs. of Detroit Carpenters Fringe Benefits Fund v. Indus. Contracting, LLC*, 581 F.3d 313, 317 (6th Cir. 2009).  However, when alter-ego determinations are made as part of a decision to grant or deny summary judgment, we review them *de novo*, construing all reasonable inferences in favor of the nonmoving party.  *Road Sprinkler Fitters Local Union 669 v. Dorn Sprinkler Co.*, 669 F.3d 790, 794 (6th Cir. 2012).  The application of res judicata is a question of law that we review *de novo*.  *Bates v. Twp. of Van Buren*, 459 F.3d 731, 734 (6th Cir. 2009).

### II.  Analysis

#### A.  Applicability of the Alter-Ego Test of the NLRA

Defendant first argues that the district court erred by applying the alter-ego test of the NLRA to Plaintiff's ERISA claim.  However, Defendant did not challenge the applicability of the alter-ego test of the NLRA before the district court.  In fact, Defendant affirmatively invited any error by asking the district court to grant it summary judgment on the basis of the alter-ego test of the NLRA.  Therefore, Defendant has not preserved this issue for appellate review.  *See City of Columbus, Ohio v. Hotels.com, L.P.*, 693 F.3d 642, 652 (6th Cir. 2012) ("Generally, an [issue] not raised before the district court is waived on appeal."); *Harris v. Roadway Exp. Inc.*, 923 F.2d 59, 61 (6th Cir. 1991) ("The doctrine of invited error is a branch of the doctrine of

waiver by which courts prevent a party from inducing an erroneous ruling and later seeking to profit from the legal consequences of having that ruling set aside.").

Nevertheless, Defendant asks us to exercise our discretion to entertain issues not raised before the district court. *See Harris v. Klare*, 902 F.3d 630, 636 (6th Cir. 2018) ("[I]t is within the ambit of our discretion to entertain [issues] not raised below."). Whether we should oblige Defendant's request is guided by the following factors:

> 1) whether the issue newly raised on appeal is a question of law, or whether it requires or necessitates a determination of facts; 2) whether the proper resolution of the new issue is clear and beyond doubt; 3) whether failure to take up the issue for the first time on appeal will result in a miscarriage of justice or a denial of substantial justice; and 4) the parties' rights under our judicial system to have the issues in their suit considered by both a district judge and an appellate court.

*Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008) (quoting *Friendly Farms v. Reliance Ins. Co.*, 79 F.3d 541, 545 (6th Cir. 1996)).

In this case, the factors set forth in *Friendly Farms* weigh against entertaining the issue of the applicability of the alter-ego test of the NLRA to Plaintiff's ERISA claim. The proper resolution of this issue is not clear and beyond doubt, as whether the alter-ego test of the NLRA applies to ERISA claims is an issue of first impression for this Court and the circuits that have decided it are split. *Compare Mass. Carpenters Cent. Collection Agency v. Belmont Concrete Corp.*, 139 F.3d 304, 308 (1st Cir. 1998) (applying the NLRA's alter-ego test to an ERISA claim); *Central States, Southeast & Southwest Areas Pension Fund v. Sloan*, 902 F.2d 593, 596–97 (7th Cir. 1990) (applying the NLRA's alter-ego test to an ERISA claim) *with Greater Kansas City Laborers Pension Fund v. Superior Gen. Contractors, Inc.*, 104 F.3d 1050, 1055 (8th Cir. 1997) (applying a corporate law alter-ego test to an ERISA claim). Additionally, the failure to take up this issue will not result in a miscarriage of justice because Defendant "had ample opportunity to raise the issue to the district court." *Scottsdale Ins. Co.*, 513 F.3d at 553. Such opportunity is evidenced by the fact that Defendant did more than simply fail to raise this issue; rather, Defendant *affirmatively asserted*, both in its motion for summary judgment and in its response to Plaintiff's motion for summary judgment, that the alter-ego test of the NLRA *was* applicable to Plaintiff's ERISA claim. The fact that this is an issue that does not necessitate a

determination of facts is insufficient to outweigh these factors.  *See Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 615–16 (6th Cir. 2014).

Thus, while it is within the ambit of our discretion to entertain issues not raised below, "[w]e have rarely exercised such discretion," and choose not to do so here.  *Scottsdale Ins. Co.*, 513 F.3d at 552.  Rather, we assume that the alter-ego test of the NLRA applies to Plaintiff's ERISA claim, and proceed to its application.

**B.  Application of the Alter-Ego Test of the NLRA**

Defendant next argues that the district court erred by determining that Defendant is the alter ego of Trucking under the alter-ego test of the NLRA.

The alter-ego doctrine is an equitable doctrine that "allows courts to treat two companies as the same entity when necessary to prevent either of them from manipulating its corporate form to evade its labor obligations."  *Bd. of Trustees of Local 17 Iron Workers Pension Fund v. Harris Davis Rebar, LLC*, 800 F.3d 289, 291 (6th Cir. 2015).  We have applied the alter-ego doctrine in two factual contexts.  The first is when a new company is "merely a disguised continuance" of an older company.  *NLRB v. Fullerton Transfer & Storage Ltd., Inc.*, 910 F.2d 331, 336 (6th Cir. 1990).  The second is when two co-existing companies "are in fact one business, separated only in form."  *Id.*  In either context, the alter-ego test is the same.  *Indus. Contracting*, 581 F.3d at 318.

"The Sixth Circuit test for determining whether two companies are alter egos . . . look[s] to see 'whether the two [companies] have substantially identical management, business[] purpose, operation, equipment, customers, supervision, and ownership.'"  *Id.* (quoting *Fullerton Transfer*, 910 F.2d at 336).  An employer's "intent to evade" its labor obligations is also a factor. *Id.*  "In applying these factors, no individual factor is determinative; instead, 'all the relevant factors must be considered together.'"  *Id.* (quoting *NLRB v. Allcoast Transfer*, 780 F.2d 576, 582 (6th Cir. 1986)).  We will address each factor in turn.

*(1) Management*.  This factor looks to "the nature of the management structure in the two companies," including overlap in those who "played a managerial role."  *Road Sprinkler*,

669 F.3d at 795. In this case, at Trucking, Dan Sr., Patricia, Dan Jr., and Joe all served as corporate officers. Dan Sr., however, was "the top decision-maker," and "ma[de] [all of] the ultimate decisions." (RE 29-3, PageID # 594; RE 29-2, PageID # 572.)[3] At Defendant, Dan Jr., Joe, and Jason serve as corporate officers, and Defendant's Operating Agreement identifies each of them as a "co-manager." (RE 27-10, PageID # 300.) Thus, there is minimal similarity in "the nature of the management structure in the two companies" and minimal overlap in those who "played a managerial role," and the district court correctly determined that this factor weighs in favor of Defendant. *Compare Road Sprinkler*, 669 F.3d at 795 (holding that two companies were not alter egos where they were managed by different individuals, even though those individuals were members of the same family) *with Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 588 (6th Cir. 2006) (affirming that two companies were alter egos where they were managed by the same individuals); *Allcoast Transfer*, 780 F.2d at 582 (affirming that two companies were alter egos where they were managed by the same individual).

*(2) Business Purpose.*[4] This factor looks to overlap in the type of work performed. *Road Sprinkler*, 669 F.3d at 794. In this case, 50% of Trucking's business consisted of selling and transporting dirt, stone, and sand, and 50% consisted of construction site preparation and excavation. And 90% of Defendant's business consists of construction site preparation and excavation, with 10% consisting of snow plowing and other miscellaneous projects. In other words, 90% of Defendant's work overlaps with 50% of Trucking's work. Thus, there is significant overlap in the type of work performed, and the district court correctly determined that this factor weighs in favor of Plaintiff. *See Road Sprinkler*, 669 F.3d at 794 (holding that the fact that two companies were "engaged in the same business" supported alter-ego status); *Trustees of Painters Union Deposit Fund v. Interior/Exterior Specialist Co.*, 371 F. App'x 654, 660 (6th Cir. 2010) (affirming that two companies were alter egos where their business purposes were "separate but not mutually exclusive"); *NLRB v. Crossroads Elec., Inc.*, 178 F. App'x 528, 533

---

[3]Except as otherwise indicated, record citations refer to the record in district court action No. 15-cv-12272.

[4]While this Court listed "business" and "purpose" as separate factors in *Fullerton Transfer*, *see* 910 F.2d at 336, the vast majority of this Court's subsequent decisions have combined them into a single factor. *See, e.g.*, *Road Sprinkler*, 669 F.3d at 794; *Indus. Contracting*, 581 F.3d at 315; *Allcoast Transfer*, 780 F.2d at 582.

(6th Cir. 2006) (affirming that two companies were alter egos where they were "engaged in primarily the same type of work").

*(3) Operations.*  This factor looks to "continuity of work force"—*i.e.*, whether the new company "attracted . . . employees of its own" or "employed a number of former employees of [the older company]"—and to continuity of work space. *Road Sprinkler*, 669 F.3d at 795.  In this case, at least five of Defendant's eight employees are former employees of Trucking—Dan Jr., Joe, Jason, Craig, and Vince Gomez.  Defendant also retains the accounting services of Gregg Greenwood—Trucking's former accountant—and the legal services of John Lozano— Trucking's former bankruptcy attorney.  As for work space, Defendant operates out of Dan Jr.'s home, while Trucking operated out of an office building, both in Saginaw, Michigan.

Thus, although there is no continuity of work space, there is significant continuity of work force, and the district court correctly determined that this factor weighs in favor of Plaintiff. *Compare Yolton*, 435 F.3d at 588 (affirming that two companies were alter egos where they had the "same employees"); *Wilson v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 83 F.3d 747, 759 (6th Cir. 1996) (affirming that two companies were alter egos where they "shared the same corporate headquarters and exchanged employees"); *Allcoast Transfer*, 780 F.2d at 582–83 (affirming that two companies were alter egos where the new company employed "two truck drivers" and some "clerical staff" that were former employees of the older company) *with Road Sprinkler*, 669 F.3d at 795 (holding that two companies were not alter egos where two of the new company's fourteen employees were former employees of the older company and the new company rented separate office space from the older company).

*(4) Equipment.*  This factor looks to whether the new company acquired any of the older company's equipment, and if so, whether the acquisition was an arm's-length transaction. *Road Sprinkler*, 669 F.3d at 796.  In this case, Defendant did not acquire any of Trucking's equipment, which was all sold as a result of Trucking's bankruptcy.  Thus, the district court correctly determined that this factor weighs in favor of Defendant. *Compare Road Sprinkler*, 669 F.3d at 796 (holding that two companies were not alter egos where the new company acquired an "insubstantial" amount of the older company's equipment through an arm's-length transaction with the older company) *with Allcoast Trasfer*, 780 F.2d at 582 (affirming that two companies

were alter egos where the new company "primarily obtained" its equipment from the older company); *Crossroads Elec.*, 178 F. App'x at 534 (affirming that two companies were alter egos where the older company gave most of its equipment to the new company free of charge).

*(5) Customers.* This factor looks to overlap in "customer base" and "customers." *Road Sprinkler*, 669 F.3d at 796. In this case, Trucking operated throughout Michigan's Lower Peninsula. Defendant operates in Saginaw, Bay, and Midland counties in Michigan's Lower Peninsula. In other words, while Defendant's customer base is somewhat smaller than Trucking's customer base, it is contained entirely within Trucking's customer base. And of the approximately 22 customers that Defendant serviced from 2013 to 2016, 15 were former customers of Trucking. Thus, there is some overlap in "customer base" and significant overlap in "customers," and the district court correctly determined that this factor weighs in favor of Plaintiff. *Cf. Trustees of Detroit Carpenters Fringe Benefits Fund v. Patrie Constr. Co.*, 618 F. App'x 246, 254 (6th Cir. 2015) (holding that two companies were not alter egos where there was only "a single instance of a shared customer or project"); *Road Sprinkler*, 669 F.3d at 796 (holding that two companies were not alter egos where 9 out of 250 of the new company's customers were former customers of the older company).

*(6) Supervision.* This factor looks to overlap in those who hold supervisory roles. *Allcoast Transfer*, 780 F.2d at 582. The NLRA defines "supervisor" broadly as "any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them . . . [if] such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." 29 U.S.C. § 152(11). In this case, Dan Jr. and Joe conceded that they, along with Dan Sr., were supervisors at Trucking. Dan Jr. and Joe also conceded that they, along with Jason, are supervisors at Defendant. Thus, there is significant overlap in those who hold supervisory roles, and the district court correctly determined that this factor weighs in favor of Plaintiff. *See Wilson*, 83 F.3d at 759 (affirming that two companies were alter egos where the same individual held a supervisory role at both); *Allcoast*, 780 F.2d at 582 (affirming that two companies were alter egos where the same individual held a supervisory role at both); *Nelson*

*Elec. v. NLRB*, 638 F.2d 965, 968 (6th Cir. 1981) (affirming that two companies were alter egos where the same individuals held supervisory roles at both).

  *(7) Ownership*. This factor looks to overlap in those with an ownership interest. *Road Sprinkler*, 669 F.3d at 794–95; *Crossroads Elec.*, 178 F. App'x at 533. In this case, Trucking was owned by Dan Sr. (30.7%), Patricia (30.7%), Dan Jr. (9.65%), Barb (9.65%), Cindy (9.65%), and Joe (9.65%). And Defendant is owned by Dan Jr. (33.33%), Joe (33.33%), and Jason (33.33%). In other words, individuals that owned approximately 20% of Trucking now own 66.66% of Contracting. Thus, there is significant overlap in those with an ownership interest, and the district court correctly determined that this factor weighs in favor of Plaintiff. *Compare Interior/Exterior Specialist Co.*, 371 F. App'x at 660 (affirming that two companies were alter egos where there was "some overlap" in ownership); *Crossroads Elec.*, 178 F. App'x at 533 (affirming that two companies were alter egos where the same individuals owned 100% of both) *with Road Sprinkler*, 669 F.3d at 794–95 (holding that two companies were not alter egos where there was no overlap in ownership).

  *(8) Intent to Evade Labor Obligations*. This factor looks to "evidence of intent on the part of the two companies to avoid the effect of the collective bargaining agreement" or their other labor obligations. *Road Sprinkler*, 669 F.3d at 796. In this case, the timing of, individuals involved in, and concessions made regarding both Trucking's demise and Defendant's formation all "support th[e] inference" that Defendant was formed in order to retain the benefits of Trucking without having to retain its liabilities. *Id.* Dan Jr., Joe, and bankruptcy attorney John Lozano each attended the meeting at which it was determined that Trucking could not afford to pay the assessed amount of withdrawal liability, and at which filing for bankruptcy was first discussed as a response option. Dan Jr. and Joe, along with Jason, then incorporated Defendant on November 2, 2012—the day after Trucking missed its first withdrawal liability payment. John Lozano prepared and submitted the Articles of Incorporation. Defendant then bid on its first project on March 10, 2013—two days before Trucking filed for bankruptcy. Dan Jr. and John Lozano prepared and submitted the Voluntary Petition. And Dan Jr. and Joe ultimately conceded that throughout this process, it was "important" for Defendant to keep the Bourdow name because people "know the name" through Trucking and because Defendant could benefit

from the "goodwill" that Trucking had accrued under the name.  (RE 29-3, PageID # 627; RE 29-4, PageID # 657.)  Thus, there is persuasive evidence of intent to evade labor obligations, and the district court incorrectly determined that this factor weighs in favor Defendant.  Rather, it weighs in favor of Plaintiff.[5]  *Compare Road Sprinkler*, 669 F.3d at 796 (holding that two companies were not alter egos where there was no evidence of intent to evade labor obligations) *with NLRB v. CJR Transfer, Inc.*, 952 F.2d 403, at *3 (6th Cir. 1992) (Table) (affirming that two companies were alter egos where the "primary purpose" of the new company was to avoid labor obligations).

In sum, six of the factors weigh in favor of Plaintiff—business purpose, operations, customers, supervision, ownership, and intent to evade labor obligations—and two of the factors weigh in favor of Defendant—management and equipment.  And there is no reason that the two factors in favor of Defendant would outweigh the six factors in favor of Plaintiff.  Accordingly, the district court correctly determined that Defendant is "merely a disguised continuance" of Trucking.  *Fullerton Transfer*, 910 F.2d at 336; *see also Road Sprinkler*, 669 F.3d at 796 (holding that two companies were not alter egos where six factors weighed in favor of the defendant); *Allcoast Transfer*, 780 F.2d at 583 (affirming that two companies were alter egos where six factors weighed in favor of the plaintiff).  Thus, we hold that Defendant is the alter ego of Trucking, and "treat [the] two companies as the same entity [because it is] necessary to prevent either of them from manipulating its corporate form to evade its labor obligations." *Harris Davis Rebar*, 800 F.3d at 291.

---

[5]However, we note that this factor remains "merely one of the factors to be considered."  *Indus. Contracting*, 581 F.3d at 318.  It is neither a prerequisite factor, nor is it more important than the other factors.  *Id.* While this Court has described this factor as "clearly the focus of the alter ego doctrine," *Trustees of Resilient Floor Decorators Ins. Fund v A&M Installations, Inc.*, 395 F.3d 244, 248 (6th Cir. 2005), it has also made clear from the beginning that there are limits on this factor's probative force, emphasizing that intent "can too easily be disguised." *Fullerton Transfer*, 910 F.2d at 337.  Moreover, this Court recently characterized its decision in *A&M Installations* as one of "limited authority" that should be "confined to its facts," in part because its over-reliance on this factor "confus[ed] the *purpose* of the alter ego doctrine with the Sixth Circuit's *test for determining whether it should be applied*."  *Indus. Contracting*, 581 F.3d at 318–19.  In other words, the *purpose* of the alter-ego doctrine is to prevent intentional evasions of labor obligations, but the *test for determining whether it should be applied* considers evidence of such intent as one of eight factors that all "must be considered together."  *Id.* at 318.

**C. Res Judicata**

Defendant lastly argues that the district court erred by determining that Plaintiff was entitled to a judgment in the amount of $3,221,981 because the res judicata effect of Plaintiff's proof of claim—filed in Trucking's bankruptcy proceedings for $1,272,187—bars litigation of the amount of Defendant's liability.

"A claim is barred by the res judicata [or claim preclusive] effect of prior litigation if all of the following elements are present: '(1) a final decision on the merits by a court of competent jurisdiction; (2) a subsequent action between the same parties or their privies; (3) an issue in the subsequent action which was litigated or which should have been litigated in the prior action; and (4) an identity of the causes of action.'" *Browning v. Levy*, 283 F.3d 761, 771 (6th Cir. 2002) (quoting *Bittinger v. Tecumseh Prods. Co.*, 123 F.3d 877, 880 (6th Cir. 1997)). And it has long been established that "[n]ormal rules of res judicata . . . apply to the decisions of the bankruptcy courts." *In re Enyart*, 509 F.2d 1058, 1061 (6th Cir. 1975). We will address each element in turn.[6]

*(1) A final decision on the merits by a court of competent jurisdiction.* Plaintiff's proof of claim in Trucking's bankruptcy proceedings was allowed pursuant to 11 U.S.C § 502(a), which provides that "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects." Whether an uncontested proof of claim that is allowed pursuant to 11 U.S.C. § 502(a) is a final judgment on the merits for purposes of res judicata is an issue of first impression for this Court. Accordingly, we look to helpful cases from other circuits.

---

[6]The term "res judicata" is at times used to refer to claim preclusion, and contrasted with the term "collateral estoppel," used to refer to issue preclusion. *See Gargallo v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 918 F.2d 658, 660–61 (6th Cir. 1990). However, at other times the term "res judicata" is used to refer to *both* claim preclusion and issue preclusion. *See Arangure v. Whitaker*, 911 F.3d 333, 337 (6th Cir. 2018). In this case, the parties use the term "res judicata" in the former sense, to refer to claim preclusion only. Accordingly, we address claim preclusion only. *See Goodwin v. Summit Cty.*, 703 F. App'x 379, 385 (6th Cir. 2017); *Doe v. Jackson Local Sch. Dist.*, 422 F. App'x 497, 500 (6th Cir. 2011). While Defendant also raises a collateral estoppel argument in its reply brief, "arguments made to us for the first time in a reply brief are waived." *Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010).

The Second, Fifth, and Ninth Circuits have each held that an uncontested proof of claim that is allowed pursuant to 11 U.S.C. § 502(a) is a final judgment on the merits for the purposes of res judicata. *See EDP Medical Comput. Sys., Inc. v. United States*, 480 F.3d 621, 627 (2d Cir. 2007); *Siegel v. Fed. Home Loan Mortg. Corp.*, 143 F.3d 525, 530–31 (9th Cir. 1998); *Matter of Baudoin*, 981 F.2d 736, 742 (5th Cir. 1993). And the First Circuit has assumed as much. *See Giles World Mktg., Inc. v. Boekap Mfg., Inc.*, 787 F.2d 746, 747–48 (1st Cir. 1986). No circuit has held otherwise. We find the reasoning of these cases persuasive.

In *EDP Medical*, EDP Medical filed for Chapter 7 bankruptcy. 480 F.3d at 623. As part of EDP Medical's bankruptcy proceedings, the Internal Revenue Service ("IRS") filed a proof of claim against EDP Medical for tax liability of $166,181. *Id.* No objections were raised, and the district court issued an order allowing the claim. *Id.* The bankruptcy trustee then paid the claim, and the bankruptcy case was closed. *Id.* at 624.

Subsequently, however, EDP Medical sued the IRS challenging that tax liability, and the IRS argued that the res judicata effect of its proof of claim barred the suit. *Id.* The Second Circuit agreed, holding that a bankruptcy court's order allowing an uncontested proof of claim pursuant to 11 U.S.C. § 502(a) constitutes a final judgment on the merits for purposes of res judicata. *Id.* at 622. The court reasoned that res judicata "applies with full force to matters decided by the bankruptcy courts," and that the values underlying the doctrine—judicial economy and prevention of inconsistent decisions—are particularly served by applying it to Chapter 7 bankruptcy proceedings, "where it is desirable that matters be resolved as expeditiously and economically as possible." *Id.* at 625.

In *Siegel*, Siegel filed for Chapter 7 bankruptcy. 143 F.3d at 532. As part of Siegel's bankruptcy proceedings, the Federal Home Loan Mortgage Corporation ("Freddie Mac") filed two proofs of claim against Siegel for mortgage loan liability on two pieces of property. *Id.* at 527–28. No objections were raised, and the claim was deemed allowed without a court order. *Id.* at 528. Freddie Mac foreclosed on the properties, and the bankruptcy case was closed. *Id.*

Subsequently, however, Siegel sued Freddie Mac challenging those foreclosures, and Freddie Mac argued that the res judicata effect of its proof of claim barred the suit. *Id.* The

Ninth Circuit agreed, holding that an uncontested proof of claim that is allowed pursuant to 11 U.S.C. § 502(a) is a final judgment on the merits for purposes of res judicata even without a separate court order specifically allowing the claim. *Id.* at 530. The court reasoned that "the allowance or disallowance of a claim in bankruptcy should be given like effect as any other judgment of a competent court, in a subsequent suit against the bankrupt or anyone in privity with him," and that "the lack of a separate court order is a distinction without a difference." *Id.* at 529–30. The court further explained:

> Of course, if the court formally actually allows the claim, there can be little doubt about the ultimate res judicata effect of that allowance. But it is equally clear that when a claim is "deemed allowed" [pursuant to 11 U.S.C. § 502(a)] it has the same effect. Consider: what else can 'deemed allowed' mean? It must mean deemed allowed by the court. In other words, it is deemed that the court has acted on the claim and ordered allowance. Congress has relieved the court of the task of actually endorsing its allowance of the claim on that document or on a separate form of order. . . . It would be most peculiar if the effect was that uncontested and allowed claims had less dignity for res judicata purposes than a claim which at least one party in interest thought was invalid or contestable in whole or in part. We see no reason to embrace that rather peculiar result. Rather, we see § 502(a) as a recognition of the fact that people can raise objections and litigate them, if they see something wrong with a claim, but if they do not, the claim will be treated in all respects as a claim allowed by the court itself.

*Id.* at 530.

The courts in both *EDP Medical* and *Siegel* also distinguished the Fourth Circuit's decision in *County Fuel Co. v Equitable Bank Corp.*, 832 F.2d 290 (4th Cir. 1987). In that case, the court expressed its "doubt that the 'automatic allowance' under 11 U.S.C. § 502(a) of a claim not objected to constitutes a 'final judgment'" for purposes of res judicata. *Id.* at 292. Specifically, the court noted that under bankruptcy law there are certain circumstances in which parties can object to or seek reconsideration of a proof of claim *after* its allowance, casting doubt on its finality. *Id.* However, the courts in *EDP Medical* and *Siegel* reasoned that those concerns "dissipate" or "lose force" where "the debtor has received its discharge and the bankruptcy proceeding is closed." 480 F.3d at 625–26; 143 F.3d at 530. "By then, any lingering doubts about finality surely would have been assuaged." *Siegel*, 143 F.3d at 530. Moreover, both courts also reasoned that any discussion of res judicata in *County Fuel* was dicta, as the case was

ultimately decided on waiver grounds. 480 F.3d at 625 n.2; 143 F.3d at 530. Thus, *County Fuel* is distinguishable.[7]

In this case, as in *EDP Medical* and *Siegel*, Trucking filed for Chapter 7 bankruptcy. As part of Trucking's bankruptcy proceedings, Plaintiff filed a proof of claim against Trucking for $1,272,187 for withdrawal liability. No objections were raised and, as in *Siegel*, the claim was allowed pursuant to 11 U.S.C. § 502(a) without a separate court order specifically allowing the claim. The bankruptcy trustee then paid a portion of the claim—$52,034—and the bankruptcy case was closed.

Subsequently, Plaintiff sued Defendant seeking the outstanding withdrawal liability on an alter-ego theory of liability. However, Plaintiff sought an amount greater than the amount of its proof of claim. Defendant argues that the res judicata effect of Plaintiff's proof of claim bars litigation of the amount of its liability. For the reasons articulated in *EDP Medical* and *Siegel*, we hold that that an uncontested proof of claim that is allowed pursuant to 11 U.S.C. § 502(a) is a final judgment on the merits for the purposes of res judicata, with or without a separate court order specifically allowing the claim.

*(2) A subsequent action between the same parties and their privies.* Defendant is the alter ego of Trucking, and thus we hold that Plaintiff's ERISA claim is a subsequent action between the same parties. *See Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Aguirre*, 410 F.3d 297, 302 (6th Cir. 2005) ("[A] contention that *A* is *B*'s 'alter ego' asserts that *A* and *B* are the same entity.").

*(3) An issue in the subsequent action which was litigated or which should have been litigated in the prior action.* The difference between the amount awarded by the district court and the amount of Plaintiff's proof of claim reflects interest and fees awarded pursuant to

---

[7]Equally distinguishable are the two cases within this Circuit that have questioned the holdings in *EDP Medical* and *Siegel*. *See In re Khan*, 2011 WL 6179941, at *5 (Bankr. E.D. Tenn. Dec. 13, 2011); *Kismet Prods., Inc. v. HCC Benefits Corp.*, 2008 WL 1843987, at * 7 (N.D. Ohio Apr. 22, 2008). In *Khan*, the court did not discuss *EDP Medical* as additional authority weighing in favor of adopting the holding in *Siegel*. And in *Kismet Prods.*, the bankruptcy proceeding was still pending.

29 U.S.C. § 1132(g)(2).[8]    Accordingly, this element looks to whether the interest and fees awarded pursuant to § 1132(g)(2) were litigated or should have been litigated in Trucking's bankruptcy proceedings.

The interest and fees awarded pursuant to § 1132(g)(2) *could* have been litigated in Trucking's bankruptcy proceedings.   In November 2012, Plaintiff filed a lawsuit against Trucking that was subsequently stayed when Trucking filed for Chapter 7 bankruptcy.  If the lawsuit had been successful, Plaintiff would have been entitled to the interest and fees awarded pursuant to §1132(g)(2).  Accordingly, Plaintiff could have included that amount in its proof of claim.  And we note that other courts have addressed disputes over damages authorized by § 1132(g) in the context of bankruptcy proceedings. *See, e.g.*, *In re Interstate Bakeries Corp.*, 704 F.3d 528, 537 (8th Cir. 2013) (reviewing a bankruptcy court's decision regarding fees awarded pursuant to § 1132(g)); *Bannistor v. Ullman*, 287 F.3d 394, 408 (5th Cir. 2002) (reviewing a bankruptcy court's decision regarding fees awarded pursuant to § 1132(g)); *In re World Sales, Inc.*, 183 B.R. 872, 878 (9th Cir. BAP 1995) (reviewing a bankruptcy court's decision regarding interest and fees awarded pursuant to § 1132(g)(2)).  Thus, we hold that the interest and fees awarded pursuant to § 1132(g)(2) *should* have been litigated in Trucking's bankruptcy proceedings. *See Rivers v. Barberton Bd. of Educ.*, 143 F.3d 1029, 1032 (6th Cir. 1998); *see also Wilkins v. Jakeway*, 183 F.3d 528, 532 n.4 (6th Cir. 1999).

*(4) An identity of the causes of action.*  An identity of the causes of action exists "if the claims arose out of the same transaction or series of transactions, or if the claims arose out of the same core of operative facts." *Winget v. JP Morgan Chase Bank*, 537 F.3d 565, 580 (6th Cir. 2008).  This Court has also stated that an identity of causes of action exists if there is an identity of "the facts creating the right of action and of the evidence necessary to sustain each action," *Sanders Confectionary Prods., Inc. v. Heller Financial, Inc.*, 973 F.2d 474, 484 (6th Cir. 1992), the evidentiary component looking to "whether the same underlying factual evidence could

---

[8]29 U.S.C. § 1132(g)(2) provides that "[i]n any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title [pertaining to delinquent contributions] in which a judgment in favor of the plan is awarded, the court shall award the plan [interest and various fees, including reasonable attorney's fees]." An action to recover withdrawal liability is such an action because "any failure of [an] employer to make any withdrawal liability payment within the time prescribed shall be treated in the same manner as a delinquent contribution (within the meaning of section 1145 of this title)." *Id.* § 1451.

support and establish both [claims]." *Heike v. Cent. Mich. Univ. Bd. of Trs.*, 573 F. App'x 476, 483 (6th Cir. 2014). Thus, the critical consideration is operative "factual overlap" between the claims. *Id.* (quoting *United States v. Tohono O'odham Nation*, 563 U.S. 307, 315 (2011)).

Plaintiff's proof of claim arose out of, and was created by, Trucking's failure to make withdrawal liability payments to Plaintiff. Accordingly, the operative facts of that claim included Trucking's entry into and withdrawal from its collective bargaining agreement with the Union, and Plaintiff's assessment of and demand for withdrawal liability. In contrast, Plaintiff's current claim arises out of, and was created by, Defendant's status as Trucking's alter ego. Accordingly, the operative facts of this claim include, as discussed above, the substantial identity between Defendant and Trucking with regard to management, business purpose, operation, equipment, customers, supervision, and ownership. Thus, there is not an identity of "the facts creating the right of action and of the evidence necessary to sustain each action." *Sanders Confectionary Prods.*, 973 F.3d at 484; *see also Heike*, 573 F. App'x at 483. Plaintiff's proof of claim required only factual evidence of Trucking's missed withdrawal liability payments, while Plaintiff's current claim also requires factual evidence of Defendant's substantial identity to Trucking.

This difference between Plaintiff's claims is highlighted by Defendant's concession that "[t]he question of whether Trucking incurred withdrawal liability *[is] not an issue in this matter*." (Brief for Appellant at 38.) (emphasis added). Rather, "[t]he cause of action in this [matter is] to determine if [Defendant] was an alter ego based [on] whether there [is] an identity of interests between Trucking and [Defendant] such that [Defendant] would be a new source for collection of Trucking's withdrawal liability." (*Id.*) In this way, Defendant likens Plaintiff's current claim to a post-judgment collection action which "fastens liability" that has been pre-determined.[9] (*Id.* at 37.) (quoting *In re RCS Engineered Prods. Co., Inc.*, 102 F.3d 223, 226 (6th Cir. 1996)).

---

[9]Defendant's emphasis of this difference underscores the fact that collateral estoppel—which does not require an identity of the causes of action—may have been a more successful argument for Defendant. Indeed, the relief Defendant alludes to throughout its briefs to this Court is the type of relief typically sought in collateral estoppel cases—barring litigation of an *issue*—not the type of relief typically sought in res judicata cases, *i.e.*,

Because Plaintiff's claims do not arise out of, and were not created by, the same operative facts, we hold that there is no identity of the causes of action. *See Winget*, 537 F.3d at 580; *Sanders Confectionary Prods.*, 973 F.3d at 484. Accordingly, we hold that the res judicata effect of Plaintiff's proof of claim does not bar litigation of the amount of Defendant's liability. Thus, the district court did not err by determining that Plaintiff was entitled to a judgment in the amount of $3,221,981.

## CONCLUSION

For the reasons set forth above, we **AFFIRM** the district court's grant of summary judgment.

---

barring litigation of a *claim*. *See Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 582 (6th Cir. 1994). However, Defendant did not raise a collateral estoppel argument until its reply brief. *See supra*, note 6.