NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0178n.06

No. 21-1558

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Apr 28, 2022
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| MATTHEW JAMES BAWKEY, | ) | THE WESTERN DISTRICT OF |
| | ) | MICHIGAN |
| Defendant-Appellant. | ) | |
| | ) | |

Before: SILER, BUSH, and MURPHY, Circuit Judges.

MURPHY, Circuit Judge. Police officers executing a search warrant found firearms and ammunition in the home of Matthew Bawkey, a felon. Bawkey pleaded guilty to possessing ammunition, but he adamantly denied knowing about the guns. The district court did not believe him. Bawkey's relatives had said that the guns belonged to him. And he told the police soon after the search that his father had been storing them at his house, a story incompatible with his purported lack of knowledge. When calculating Bawkey's guidelines range, the court decided that his knowledge of the guns triggered two firearm enhancements and that his lying about them disqualified him from receiving an acceptance-of-responsibility reduction. It imposed a 78-month sentence. Bawkey renews his claim that he did not know about the firearms and separately asserts that the district court failed to give sufficient weight to his mitigating circumstances when choosing

his sentence. But the court's factual findings were far from clearly erroneous, and its bottom-of-the-guidelines sentence was eminently reasonable. We affirm.

I

On February 10, 2020, in the middle of a Michigan winter, someone in the Kalamazoo area reported a stolen snowmobile to the police. Thankfully for the victim, the culprit left tracks in the snow while riding the snowmobile away from the location of the theft. The incriminating tracks led the police straight to Bawkey's house. Bawkey initially allowed officers to a search a part of his property, but he withdrew his consent when they asked to search areas that he did not want them to see. The officers responded by getting a search warrant. They received permission to look not just for the stolen snowmobile but also for boots with soles matching the footprints left in the snow near the theft.

When executing this warrant, the police discovered the stolen snowmobile hidden under a tarp and pallets in Bawkey's backyard. While looking for the boots inside his house, they found what appeared to be firearm cases and ammunition boxes in a basement closet. The police verified that Bawkey was a felon who could not possess firearms and obtained a second search warrant to confiscate the suspected firearms and ammunition. They ended up seizing eight guns, including a sawed-off shotgun, and several different kinds of ammunition. The police arrested Bawkey.

He agreed to speak with an officer during a recorded interrogation. Bawkey denied stealing the snowmobile, shifting blame to his brother for this theft. Bawkey also stated that the firearms belonged to his father and that he had been keeping them because of a flood at his father's house. When asked how long the firearms had been there, Bawkey answered: "[I]t's been a few months." PSR, R.41, PageID 171. The officer then confronted Bawkey with the fact that one of the ammunition boxes was labeled "Matts" (not with his father's name). *Id.*, PageID 171, 175.

2

Bawkey confessed that he "used to have a, a gun, so." *Id.*, PageID 171. Given the kinds of ammunition recovered, the officer later asked: "[D]o you have an M4 in there somewhere?" *Id.* Bawkey answered in the negative: "No I don't have, no -- whatever guns, they're right there." *Id.*

The government's original three-count indictment alleged that, on or about February 10, 2020, Bawkey illegally possessed two unregistered firearms and illegally possessed firearms as a felon. In the months after Bawkey's arrest, officers interviewed several people to gather more evidence. Bawkey's father acknowledged that his house had recently flooded, but he otherwise undercut the story that Bawkey told the police during the interrogation. According to Bawkey's father, Bawkey had been the one who had kept guns at their respective homes. Bawkey's father denied owning the guns and suggested that he had never seen most of them.

Bawkey's brother likewise noted that the seized guns belonged to Bawkey. He told the police that he had moved Bawkey's guns from their father's house to Bawkey's house within the past year. Bawkey's brother also opined that the handwritten "Matts" on the seized ammunition box matched Bawkey's handwriting.

Bawkey's daughter and her boyfriend lived with Bawkey. They denied owning firearms or knowing about the ones in the basement. Like Bawkey's brother, his daughter opined that the guns likely belonged to her father and that the handwritten "Matts" looked like his handwriting. She even recognized one of the firearms, recalling that her father had taken her shooting with it in the past two years or so.

After these interviews, the government filed a superseding indictment. The new indictment added a count for illegally possessing ammunition as a felon. It also amended the earlier counts by expanding the time of Bawkey's illegal firearms possession to between August 10, 2019, and February 10, 2020.

Bawkey eventually entered into a plea agreement. He pleaded guilty to the fourth count of being a felon in possession of ammunition in violation of 18 U.S.C. § 922(g)(1). The government agreed to dismiss the other counts as part of the plea deal, but Bawkey recognized that the court may use the conduct underlying those counts when choosing the appropriate sentence. At his plea hearing, Bawkey admitted that he had possessed ammunition when taking his daughter shooting around August 2019 and that this ammunition had been in his home the following February.

When preparing Bawkey's presentence report, a probation officer interviewed Bawkey. Bawkey again admitted to possessing the ammunition that he had used when shooting with his daughter. In written responses, he explained that he had taken his daughter to a rural location to show her "how to shoot a gun the right way." PSR, R.41, PageID 178. Bawkey, however, denied knowing about the eight guns in his home in February 2020. He now claimed that his brother, who had allegedly concealed the snowmobile at his house, had also been storing the guns there "without [his] knowledge." *Id.*

The probation officer concluded that these written statements conflicted with Bawkey's statements during his interrogation and with those provided to the police by his relatives. Over Bawkey's objection, therefore, the presentence report recommended that the district court disbelieve Bawkey's contention that he had not known about the guns in his basement. According to the report, this finding would have three significant effects on Bawkey's guidelines range. The report recommended that the court deny Bawkey a two-level decrease to his offense level for accepting responsibility because he had "falsely denied relevant conduct." *Id.*, PageID 179–80. The report next recommended that the court impose a four-level increase to his offense level because his offense had involved the eight firearms found in his basement and a two-level increase

4

because one of those firearms was a sawed-off shotgun. These calculations left Bawkey with a guidelines range of 78 to 97 months.

At sentencing, Bawkey renewed his objection to the two firearm enhancements and the rejection of the acceptance-of-responsibility reduction. Bawkey raised the same argument for all three guidelines provisions: that he had not known about the guns in his basement. In support of this argument, Bawkey's aunt testified about his mental-health struggles, including his bipolar disorder. His counsel suggested that this condition could have affected what Bawkey said to the police during his interrogation. His aunt also described Bawkey's brother as "one of the most dishonest people I've ever met." Sent. Tr., R.60, PageID 293.

The district court overruled Bawkey's objection. It found by a preponderance of the evidence that he had knowingly possessed the firearms in his basement. The court relied on the interviews of Bawkey's relatives and the video of his interrogation. It rejected Bawkey's argument that his demeanor in the video suggested that he had been having a "manic" episode. *Id.*, PageID 317. And it explained that Bawkey's changing story over how the guns had gotten to his basement suggested that he had known they were there. *Id.*, PageID 319. The court imposed a sentence at the bottom of his guidelines range: 78 months in prison and 3 years of supervised release.

## II

Bawkey raises procedural and substantive challenges to his sentence. Procedurally, he argues that the district court wrongly calculated his guidelines range. Substantively, he argues that the court chose an unreasonable term of imprisonment by overlooking relevant factors.

### A. Procedural Challenge

Bawkey initially renews his challenges to the three guidelines calculations that he raised in the district court. The district court imposed a four-level enhancement because Bawkey's "offense

involved" eight firearms. U.S.S.G. § 2K2.1(b)(1)(B). It imposed a two-level enhancement because his "offense involved" a "destructive device" (the sawed-off shotgun). *Id.* § 2K2.1(b)(3)(B). And it denied a two-level reduction for his "acceptance of responsibility" because he lied about his knowledge of the firearms. *Id.* § 3E1.1(a). Bawkey claims that the court misapplied these provisions and that we should remand for resentencing under a properly calculated guidelines range. *See United States v. Riccardi*, 989 F.3d 476, 480–81 (6th Cir. 2021).

At the outset, it is worth noting the issues that we need not decide to resolve Bawkey's challenges. Neither party has raised any legal arguments about the proper meaning of these three provisions. Bawkey does not dispute that his "offense" (felon in possession of ammunition) would have "involved" the eight firearms within the meaning of § 2K2.1(b)(1)(B) (and § 1B1.3(a), the "relevant conduct" guideline) if he had known that the firearms were in his basement. *Cf. Shular v. United States*, 140 S. Ct. 779, 785 (2020); *United States v. Conway*, 513 F.3d 640, 642–43 (6th Cir. 2008). The government likewise does not dispute Bawkey's view that § 2K2.1(b)(1)(B) required him to have knowledge that the firearms were in his basement for his offense to have "involved" them. Similarly, Bawkey does not dispute that a sawed-off shotgun qualifies as a "destructive device" under § 2K2.1(b)(3)(B). *Cf. United States v. Wynn*, 191 F. App'x 393, 395–96 (6th Cir. 2006). And he does not dispute that lying about his knowledge of the firearms would suffice to show that he had not "accept[ed]" "responsibility" for them under § 3E1.1(a). *Cf. United States v. Thomas*, 933 F.3d 605, 612 (6th Cir. 2019). We thus need not consider any of these (or other) legal issues to resolve Bawkey's guidelines challenges.

Instead, Bawkey's challenges all turn on the same (purely factual) question: Did he know that the eight firearms were in his basement in February 2020? *Cf. United States v. Ranzoni*, 732 F.2d 555, 559 (6th Cir. 1984). The district court answered "yes." And we owe substantial

deference to its finding about such a "'historical' fact"—that is, a finding about "who did what, when or where, how or why[.]" *Thomas*, 933 F.3d at 608 (quoting *U.S. Bank Nat'l Ass'n v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 966 (2018)). We review that finding only for clear error. *See id.* Under this test, we must reject Bawkey's claim as long as the district court's contrary finding (that Bawkey knew of the firearms) was "plausible" when considered against the record as a whole. *United States v. Caston*, 851 F. App'x 557, 560 (6th Cir. 2021) (citation omitted). And if the evidence would allow the court to make a finding either way (that Bawkey did or did not know of the firearms), we must respect the court's choice between these competing views even assuming we would have chosen the opposite one. *See id.*; *see also Cooper v. Harris*, 137 S. Ct. 1455, 1468 (2017); *United States v. Sands*, 4 F.4th 417, 420 (6th Cir. 2021).

The district court's finding passes muster under this deferential test. Before explaining why, though, we begin with a disclaimer. The clear-error test requires us to consider the record "in its entirety[.]" *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985). But not much of a record exists in this case. The district court and parties relied mostly on the probation officer's statements in the presentence report. The report transcribed a part of Bawkey's interrogation and summarized the police interviews of the other witnesses. PSR, R.41, PageID 171–77.

Was it okay for the court to rely largely on this report's factual claims rather than, for example, affidavits from witnesses? The Federal Rules of Criminal Procedure note that the district court "may accept any undisputed portion of the presentence report as a finding of fact[.]" Fed. R. Crim. P. 32(i)(3)(A); *United States v. Hudson*, 2022 WL 72009, at \*4 (6th Cir. Jan. 7, 2022). If, therefore, defendants want to put the government to its proof at sentencing, they must object to the disputed parts of the report and produce "some evidence" to call those parts into question. *United States v. Cover*, 800 F.3d 275, 278 (6th Cir. 2015) (per curiam) (citation omitted); *see*

*United States v. Mack*, 817 F. App'x 176, 177–78 (6th Cir. 2020). But Bawkey did not dispute that his father, brother, and daughter all told the officers what the report indicated they said. In the end, though, neither party questioned (or cited the governing legal rules for) the district court's heavy reliance on the presentence report. We thus merely flag this issue to ensure that our opinion is not misread. Like the parties, we will assume that the court could properly rely on the report.

The facts asserted in that report contained more than enough evidence to justify the court's finding that Bawkey knew about the guns in his basement. *Cf. Conway*, 513 F.3d at 642. For starters, Bawkey provided basic background facts about the guns during his interrogation, including where they had come from (his father's house) and how long they had been there (a few months). PSR, R.41, PageID 171. Yet how could Bawkey have known, say, the length of time that the guns had been in his basement if he did not even know they were there to begin with? The district court could conclude that these statements showed his knowledge of the firearms' presence.

The presentence report also contained plenty of evidence corroborating that Bawkey knew of the firearms. The firearms were found in the basement—the part of the house that, according to his daughter, Bawkey occupied. *Id.*, PageID 174. They were also next to an ammunition box that had been labeled "Matts" in Bawkey's handwriting. *Id.*, PageID 176. Bawkey's father, brother, and daughter also told investigators that the guns did not belong to them, and these relatives opined that they likely belonged to Bawkey. *Id.*, PageID 172–75. His daughter even recognized a gun as the one that Bawkey had used when taking her shooting in the past. *Id.*, PageID 176. Given this evidence, we see no error, "clear[] or otherwise," in the district court's finding that Bawkey knew about the firearms. *Conway*, 513 F.3d at 642; *see also United States v. Rodriguez*, 797 F. App'x 933, 936–37, 939–40 (6th Cir. 2019). That conclusion, in turn, means that the court properly made the three guidelines calculations that Bawkey challenges.

Bawkey's four responses do not change things. *First*, Bawkey asserts that he consistently admitted to possessing the rifle and ammunition used to shoot with his daughter in August 2019 and consistently denied knowing of the guns in his home in February 2020. He adds that it would make no sense for him to lie about possessing one gun and not others because he would still be incriminating himself, but in a way that risked losing the acceptance-of-responsibility reduction. He thus argues that the only plausible "explanation" for his story "is that it is true." Appellant's Br. 17. But his story has not been "consistent." During the interrogation, he made claims that revealed his knowledge of the firearms, including that they had been in his home for months. Only later did Bawkey allege that his brother had secretly concealed the guns in his home without his knowledge. As the district court found, his evolving story about the guns revealed a "consciousness of guilt[.]" Sent. Tr., R.60, PageID 319. He also had a clear motive for asserting this belated change in memory: it would allow him to avoid the increase to his sentence that would arise from his possession of the eight firearms, including the sawed-off-shotgun. *See* U.S.S.G. § 2K2.1(b)(1)(B), (b)(3)(B).

*Second*, Bawkey argues that he was suffering from bipolar disorder at the time of the offense and that this condition affected his answers during the interrogation. He does not dispute that he made the statements that undermine his current claim. Rather, he asserts that the video of the interrogation (as opposed to the "black-and-white" transcript) shows that he was suffering a manic episode and that his "tone and volume" changed when he came to realize his brother had concealed the guns in his basement. Appellant's Br. 4. But the district court did not see "any indication from that video" that Bawkey "was suffering from any sort of episode" that would affect his answers. Sent. Tr., R.60, PageID 317. And while the court granted Bawkey two continuances so that he could get a formal doctor's evaluation explaining his condition, he ended up obtaining

9

only a note on a prescription slip summarily stating that he was bipolar. *Id.*, PageID 316–17; Med. Rec., R.50-2, PageID 245. For all the reliance that Bawkey now places on the video, moreover, he did not even put it in the record on appeal. *See* Fed. R. App. P. 11(a); *cf.* Fed. R. App. P. 10(b)(2); 6 Cir. R. 10(b); 6 Cir. I.O.P. 10(d); *see also* 16A Charles A. Wright et al., *Federal Practice and Procedure* § 3956.1, at 722–23, 731–41 (5th ed. 2019).

Regardless, even if we accepted Bawkey's claim that his "tone and volume" compelled the district court to disregard his incriminating statements to the police, it would not change the result. The statements provided by Bawkey's relatives independently sufficed for the court to plausibly find that he knew of the firearms. Those statements thus would still require us to uphold that finding under our deferential standard of review. *See Caston*, 851 F. App'x at 560.

*Third*, Bawkey points out that the government decided to file a superseding indictment expanding the timeframe of his offenses to include events in August 2019. This decision, he argues, shows that the government perceived the weakness of its case against him for the events in February 2020. He asks us to infer his lack of knowledge based on this indictment change. But an indictment is not evidence. *See Taylor v. Kentucky*, 436 U.S. 478, 485 (1978); *United States v. Chavez*, 951 F.3d 349, 363 (6th Cir. 2020). Besides, the government filed the superseding indictment because it had gathered additional evidence strengthening its case: Bawkey's attendance at a shooting outing with his daughter and his possession of firearms for years before February 2020. That the government's assessment of the case "crystallized" when it uncovered additional evidence does not, as Bawkey seems to assert, prove anything about his knowledge later. *Cf. United States v. Goodwin*, 457 U.S. 368, 381–82 (1982); *United States v. Caro-Silva*, 815 F. App'x 836, 840 (6th Cir. 2020).

*Fourth*, Bawkey's reply brief hints at a legal argument about the acceptance-of-responsibility guideline.  Even if he lied about the firearms, he notes, he still accepted responsibility for "all conduct relevant" to his possession-of-ammunition conviction.  Reply Br. 6.  He thus suggests that possession of the firearms was not "relevant conduct" for his offense.  *See* U.S.S.G. § 1B1.3(a).  But Bawkey did not make this argument in the district court, perhaps because his plea agreement explained that the court might consider the conduct underlying his dismissed firearm counts when calculating his guidelines range.  Plea Agreement, R.31, PageID 113; *cf. Conway*, 513 F.3d at 643–44.  And he has forfeited this argument on appeal by failing to raise it in his opening brief.  *See Trs. of Operating Eng'rs Loc. 324 Pension Fund v. Bourdow Contracting, Inc.*, 919 F.3d 368, 380 n.6 (6th Cir. 2019); *cf. United States v. Noble*, 762 F.3d 509, 528 (6th Cir. 2014).  We thus need not consider it.

## B.  Substantive Challenge

Bawkey next argues that the district court imposed a substantively unreasonable sentence because his 78-month prison term conflicts with various mitigating factors.  We review Bawkey's attack on his "bottom-line" term of imprisonment for an abuse of discretion.  *United States v. Goode*, 834 F. App'x 218, 220 (6th Cir. 2020); *see United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018).  And because the court chose a within-guidelines sentence, we start with a presumption that the sentence is reasonable.  *See United States v. Lynde*, 926 F.3d 275, 279 (6th Cir. 2019).

We see no valid basis under this "highly deferential" standard of review for Bawkey's claim that the district court wrongly balanced the sentencing factors in 18 U.S.C. § 3553(a).  *Rayyan*, 885 F.3d at 442.  The court started with the guidelines range of 78 to 97 months.  Sent. Tr., R.60, PageID 327; 18 U.S.C. § 3553(a)(4), (a)(6).  It then conducted an "individualized

assessment" of the other factors. Sent. Tr., R.60, PageID 327–31. The court found Bawkey's conduct serious because it involved many firearms, and he admitted that he had shot a gun in the past despite knowing that he could not legally do so. *Id.*, PageID 328–29; 18 U.S.C. § 3553(a)(1). The court also explained that Bawkey had engaged in "quite egregious" conduct during his prior felonies—twice fleeing from the police at dangerously high speeds. Sent. Tr., R.60, PageID 329; 18 U.S.C. § 3553(a)(1), (a)(2)(C). Bawkey was even on probation for one of these offenses when he committed his current offense, which showed a greater need to deter him from crime and to convince him to follow the law. Sent. Tr., R.60, PageID 329–30; 18 U.S.C. § 3553(a)(2)(A)–(B). Against these factors, however, the court also recognized Bawkey's substance-abuse problems and mental-health concerns. Sent. Tr., R.60, PageID 328, 330; 18 U.S.C. § 3553(a)(1).

Bawkey responds that the court failed to fully appreciate his mental-health struggles. To the contrary, it heard pages of testimony from Bawkey's aunt, who spoke of those struggles and of Bawkey's abusive upbringing in detail. And the court accounted for these concerns in at least two ways. It recommended that Bawkey receive substance-abuse treatment and a mental-health evaluation while in prison. Sent. Tr., R.60, PageID 328, 330. And it sentenced Bawkey to the very bottom of his guidelines range. Bawkey's claim that the court should have reduced his sentence even *further* merely asks us to rebalance the § 3553(a) factors, something that we cannot do on appeal. *See Goode*, 834 F. App'x at 221.

Bawkey next asserts that the district court overlooked that he had committed "relatively minor" felonies in the past, not violent ones. Appellant's Br. 23. But the court reasonably rejected Bawkey's forgiving view of his criminal history when it characterized his prior fleeing-police convictions as "quite egregious." Sent. Tr., R.60, PageID 329. During one of the crimes, for

example, he led the police on a high-speed chase that reached speeds of 137 miles per hour, putting the officers and any bystanders in danger. PSR, R.41, PageID 181.

Bawkey lastly seeks to use his substantive-reasonableness challenge as a way to relitigate the district court's finding that he knew of the firearms in his basement. He argues that the court failed to adequately consider his statements that his brother had been the one who had hid the guns in his house. Bawkey cites no case in which a court considered this type of "residual doubt" argument as a basis for choosing a lower sentence under the sentencing factors in § 3553(a). *Cf. United States v. Gabrion*, 719 F.3d 511, 525 (6th Cir. 2013) (en banc); *United States v. Portillo*, 458 F.3d 828, 829–30 (8th Cir. 2006). Even if a court could consider such an argument, moreover, the court here reasonably chose a sentence that tracked its prior findings of fact, including its finding that Bawkey had lied about his knowledge of the firearms. Sent. Tr., R.60, PageID 329. It did not need to reverse course by accepting Bawkey's contrary view of the evidence when choosing his sentence. The court had also already acknowledged the credibility issues with his brother, recognizing that his aunt had characterized him as a liar. *Id.*, PageID 316–18. It did not ignore Bawkey's concerns with his brother's credibility. All told, the court reasonably weighed all relevant sentencing factors.

We affirm.